UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                    Criminal No. 2:13cr156

W. WAYNE PERRY, JR.,

and

ANGELA PERRY,
            Defendants.


## OPINION and ORDER

This criminal matter is before the Court on a motion filed by defendant W. Wayne Perry, Jr. ("Perry" or "Mr. Perry") seeking a bill of particulars as to Count Fourteen of the superseding indictment, ECF No. 64, and a motion filed by the United States of America ("Government") seeking to disqualify Perry's retained counsel based on the alleged need for counsel to testify as a fact witness at trial.[1]  ECF No. 80.  Also pending before the Court is a motion filed by co-defendant Angela Perry, Mr. Perry's wife, seeking to join in the motion for a bill of particulars.  ECF No. 91.

---

[1] Perry is represented by John Davis ("Mr. Davis"), Gray Broughton ("Mr. Broughton"), and Brendan O'Toole of the law firm Williams Mullen (collectively "Perry's counsel" or "defense counsel").  Mr. Davis and Mr. Broughton are both partners at Williams Mullen and both appeared at the two motions hearings that have been conducted in this case.

This Court previously issued an Order deferring ruling on Mr. Perry's motion seeking a bill of particulars and instructed the parties to confer in an effort to agree on additional disclosures that could be made by the Government to narrow the field of evidence to be admitted at trial without giving Defendant an improper preview of the Government's case. ECF No. 74. As the parties were unable to reach such an agreement, the Court held a hearing on both motions on May 30, 2014. For the reasons set forth in detail below: (1) Angela Perry's written motion for leave to join in Mr. Perry's motion seeking a bill of particulars is **GRANTED**;[2] (2) the joint motion seeking a bill of particulars is **GRANTED**; and (3) the Government's motion to disqualify defense counsel is **DENIED**.

## I. Factual and Procedural Background

### A. Allegations in the Indictment

Mr. Perry and his wife Angela Perry (collectively with Mr. Perry, "Defendants") are charged with numerous health care fraud related offenses in an eighteen-count superseding indictment that was filed on February 5, 2014. ECF No. 61. As stated in the superseding indictment, Mr. Perry owned and operated

---

[2] The motion seeking a bill of particulars as to Count Fourteen, ECF No. 64, was initially filed only by counsel for Mr. Perry. Counsel for Angela Perry appeared at the May 30, 2014 motions hearing and orally requested leave to join in Mr. Perry's written motion. Counsel was instructed by the Court that such a request is required to be made in writing. Angela Perry's counsel subsequently filed a written motion seeking leave to join in Mr. Perry's motion. ECF No. 91.

Community Personal Care, Inc. ("CPC"), a home health care business, between January of 2009 and January of 2013. Id. The superseding indictment charges that Defendants conspired to commit health care fraud, committed health care fraud, and made false statements relating to health care matters, among other things. Id. Although the majority of the counts in the superseding indictment set forth particular allegations outlining the charged offense conduct, Count Fourteen broadly alleges that Defendants participated in falsification or alternation of "office records" over a nearly four year period without identifying those office records that were allegedly falsified.

### B. Mr. Perry's Asserted Facts

On November 29, 2012, federal agents investigating CPC executed a search warrant at CPC's office. During the search, Mr. Perry was informed by federal agents that the search was part of a Medicaid fraud investigation. Bond Hearing Tr. 23, ECF No. 79. Within several days of such search, Mr. Perry retained the Williams Mullen law firm to provide legal advice. Broughton Aff. ¶ 3, ECF No. 87. Williams Mullen immediately began an internal investigation into CPC's records, and, as characterized by Mr. Broughton of Williams Mullen, such investigation revealed documentary evidence that CPC employees, including but not limited to CPC staffing coordinators Vernice

3

Spain and Sarina Freeman, were stealing from CPC and overbilling Medicaid. Id. ¶ 4.

In December of 2012, Perry's counsel contacted federal agents and prosecuting attorneys to both share defense counsel's discovery of illegal actions undertaken by CPC employees and to request that the Government investigate such matters. Id. ¶¶ 6-8. Defense counsel specifically requested that the Government perform surveillance of an upcoming meeting between Vernice Spain and another CPC employee that purportedly had an illegal purpose. Id. ¶¶ 7-8. After Perry's counsel informed him that the Government declined the defense's invitation to coordinate the investigation of CPC employees and further chose not to perform surveillance of the reported illegal meeting, "Mr. Perry sought advice [of counsel] as to whether he could terminate the employment of Vernice Spain and Sarina Freeman." Id. ¶¶ 8-9. After consulting with counsel, Perry/CPC terminated Vernice Spain and Sarina Freeman in December of 2012. Id. ¶ 10. However, Mr. Broughton advised Mr. Perry not to take any criminal or civil action against either of the terminated employees until it was clear how the federal government's investigation unfolded. Id. ¶ 11.

Many months later, on October 16, 2013, Mr. Broughton met with both the FBI agent and Assistant United States Attorney in charge of the CPC investigation/prosecution and again informed

them that Vernice Spain and Sarina Freeman, and others, were responsible for false Medicaid billings and theft of both public and CPC funds. Id. ¶ 12. However, the Government made clear to Mr. Broughton that it believed that Mr. Perry was the "mastermind" who had orchestrated the false Medicaid billings and that both Mr. Perry and Angela Perry would likely be named as co-defendants in a criminal case. Id. Less than a month later, on November 6, 2013, a criminal indictment was returned by the grand jury against Mr. Perry, Angela Perry, and one other individual who was charged with falsification of records to cover-up the Medicaid fraud charged in the superseding indictment.[3] ECF No. 1.

After the return of the original indictment, Williams Mullen again reviewed CPC's records. Broughton Aff. ¶ 13. Such investigation revealed, as characterized by the defense, improper "bonus checks" issued in July of 2012 to Vernice Spain, Sarina Freemen, and Shavonne Freeman, that were separate and apart from their authorized CPC payroll direct deposits. Id. ¶¶ 13-14. According to Mr. Broughton, unlike the previously discovered Medicaid "kickback" scheme involving Vernice Spain and another employee, the unauthorized bonus checks issued in July of 2012 "did not appear to be tied to any false billings to

---

[3] The third named defendant, Allison Hunter-Evans, pled guilty on May 14, 2014, to one criminal count charging her with "alteration of records," in violation of 18 U.S.C. § 1519.

Medicaid, only theft directly from CPC's account." Id. ¶ 14. After discussing this matter with Mr. Perry, "Williams Mullen, as counsel for CPC and its owner, Mr. Perry, advised Mr. Perry that CPC should file a criminal complaint against Ms. Spain, Sarina Freeman and Shavonne Freeman." Id. ¶ 15. Mr. Broughton advised Mr. Perry "that Shavonne Freeman should be named in the criminal complaint" because she "had clearly received an unauthorized 'bonus' check" in July of 2012. Id. In discussing the proposed criminal complaint with Mr. Perry, a complaint that would be filed with local non-federal law enforcement authorities, Mr. Broughton "did not advise Mr. Perry to inform or not inform the [City of Norfolk] detective of the ongoing federal criminal case." Id. ¶ 16.

In addition to the affidavit Mr. Broughton submitted to this Court in opposition to the Government's pending motion, Mr. Perry submitted his own affidavit confirming each of the above statements of fact. Perry Aff., ECF No. 86. Specifically, Mr. Perry states that he fired Vernice Spain and Sarina Freeman after consulting with counsel, that he did not take any civil or criminal action against these individuals between their December 2012 termination date and October of 2013 based on defense counsel's advice to wait and see how the federal investigation unfolded, that Perry "did not authorize" the bonus checks issued in July of 2012, and that the bonus checks "did not appear to be

linked in any way to Medicaid" but instead "appeared to be stolen directly from CPC's account." Perry Aff. ¶¶ 8-10, 14. Mr. Perry further states in his sworn affidavit that Mr. Broughton communicated with both Perry and James Sears ("Mr. Sears"), CPC's former Chief Financial Officer ("CFO"), about the bonus checks and about filing a criminal complaint, that Mr. Sears and Perry made their report of embezzlement to local authorities at the direction of Mr. Broughton, and that defense counsel "did not advise [Mr. Perry] to inform or not to inform the magistrate or [local] law enforcement of the ongoing federal criminal case." Id. ¶¶ 18-22.

Further corroborating Mr. Perry's version of events, Mr. Sears also submitted a sworn affidavit to the Court outlining his communications with Perry's counsel and his involvement in filing the criminal complaint in April of 2014. Sears Aff., ECF No. 88. Specifically, Mr. Sears indicates that he provided CPC financial records to Perry's counsel at counsel's request, that typically CPC "bonus" checks were only issued around the holidays, that Perry's counsel communicated with Mr. Sears via email about filing a criminal complaint with local authorities based on the alleged embezzlement by former CPC employees, and that Mr. Sears ultimately made such report of embezzlement as CFO of CPC on April 1, 2014 "at the direction of Gray Broughton." Id. ¶¶ 8-17.

### C. Government's Asserted Facts

The Government has not advanced an affidavit offering any facts at this time, but does cite to testimony provided at Mr. Perry's bond revocation hearing conducted on May 5, 2014, by Magistrate Judge Lawrence R. Leonard.[4]   Bond Hearing Tr., ECF No. 79.   The Government also has proffered evidence that it intends to introduce at trial to demonstrate that Mr. Perry was the "mastermind" behind the Medicaid fraud charged in the superseding indictment and that he is accusing former employees Vernice Spain, Sarina Freeman, and others, of illegal conduct to deflect blame from himself.

---

[4]  The Government previously filed a motion seeking to revoke Mr. Perry's bond based on the allegation that Perry filed the criminal complaint with local authorities in an effort to intimidate Vernice Spain and Sarina Freeman because they are expected to testify against him at the upcoming federal criminal trial.  Judge Leonard, applying a "probable cause" standard, concluded that there was probable cause to believe that Mr. Perry engaged in witness intimidation.  Bond Hearing Tr. 102, ECF No. 79.  Judge Leonard appears to have based such conclusion primarily on the following facts: (1) Perry had known about the alleged embezzlement since 2012 but had not reported it until April of 2014; (2) Perry had previously hired an investigator who repeatedly attempted to interview Vernice Spain and Sarina Freeman after they were terminated from CPC; (3) In April of 2014, Perry did not inform the local detective about the federal indictment pending against him; and (4) it appeared, based on the evidence before the Court, that Shavonne Freeman, who is the daughter of Sarina Freeman, was named in the criminal complaint in an effort to intimidate Shavonne Freeman.  Id. at 101-02.  Judge Leonard, however, did not revoke Mr. Perry's bond because, as demonstrated by "the role of [defense] counsel" in the filing of the criminal complaint, Mr. Perry did not appear to be a "loose cannon" that would continue to behave inappropriately.  Id. at 103-04.  Notably, Judge Leonard's ruling was made without the benefit of the sworn statements from Mr. Perry and Mr. Broughton that are now before this Court.

As will be discussed in greater detail below, the Government fails to advance any facts suggesting the existence of any inconsistencies between defense counsel's version of events leading up to the April 2014 complaint and Mr. Perry's own version of the same events. Moreover, the Government openly acknowledges that it <u>does not dispute the accuracy of Mr. Broughton's statements in his affidavit</u>, and does not accuse defense counsel of any misconduct. However, it appears that the Government seeks to question defense counsel at trial for two reasons: (1) the Government speculates that it can elicit inconsistencies between defense counsel's testimony and Perry's testimony; and (2) the Government seeks to demonstrate, through referencing trial evidence that will be before the jury at the time the Government questions defense counsel, that Mr. Perry did not admit his criminal conduct to his lawyers, thus undercutting Perry's ability to rely on an "advice of counsel" defense at trial.

## II. Discussion - Motion for Bill of Particulars

### A. Standard

As discussed on the record at the hearing on Perry's motion seeking a bill of particulars, "the purpose of a bill of particulars is to enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial,

and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." United States v. Schembari, 484 F.2d 931, 934-35 (4th Cir. 1973) (citing United States v. Dulin, 410 F.2d 363, 364 (4th Cir. 1969)). However, a bill of particulars is "not to be used to provide detailed disclosure of the government's evidence in advance of trial." United States v. Automated Medical Labs., Inc., 770 F.2d 399, 405 (4th Cir. 1985) (citing United States v. Anderson, 481 F.2d 685, 690 (4th Cir. 1973)). A bill of particulars does not amend or alter the indictment, but instead "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." United States v. Fletcher, 74 F.3d 49, 53 (4th Cir. 1996) (citing United States v. Howard, 590 F.2d 564, 567 (4th Cir. 1979)). In considering whether to grant a defendant's motion seeking a bill of particulars, it is appropriate for the district court to inquire into the information that has already been provided by the government during discovery. United States v. Society of Independent Gasoline Marketers of America, 624 F.2d 461, 466 (4th Cir. 1980).

Although a motion seeking a bill of particulars should not be used to require the government to preview its case, in cases involving vaguely asserted charges of fraud, perjury, or alteration of records, a bill of particulars may be necessary in

10

order to provide a defendant a full and fair opportunity to prepare a defense. See United States v. Sampson, 448 F. Supp. 2d 692, 696 (E.D. Va. 2006) ("In the case of fraud or perjury, it is critical that the government identify in the indictment the dates of the fraudulent conduct, the specific fraudulent documents, and the fraudulent statements within the documents." (citing United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987))); Bortnovsky, 820 F.2d at 574 (holding that the defendants were "hindered in preparing their defense" in light of "the district court's failure to compel the Government to reveal crucial information," associated with fraud charges, including the dates of several staged burglaries and "the identity of three fraudulent documents"). A defendant is not fairly apprised of the necessary information merely because the government provided "mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified" at trial. Bortnovsky, 820 F.2d at 575; see United States v. Modi, 197 F. Supp. 2d 525, 530 (W.D. Va. 2002) (recognizing, "as argued by the defendants, that the volume of discovery in a complex case may itself impede rather than assist the defense in its understanding of the government's case," but nevertheless denying a motion for a bill of particulars in a criminal case involving a medical fraud conspiracy because the defendants conceded that the government provided "charts or

summaries" identifying the "patients at issue, the dates of services, the suspect treatments, and the amounts paid for those allegedly improper services").

### B. Analysis

Here, Defendant Perry seeks a bill of particulars only as to Count Fourteen of the superseding indictment, which broadly alleges that, over a period of <u>almost four years</u>, Defendants, and other CPC employees acting under the direction of Defendants, "knowingly altered, falsified and made a false entry" in CPC's "office records . . . including DMAS-90s" with the intent to obstruct and influence the proper administration of the federal Medicaid program.  Super. Indict. Count 14, ECF No. 61.  It appears largely undisputed from the parties' briefs and oral argument that, during discovery, the Government has in essence "opened its files" to Defendants.  However, it also appears undisputed that the Government's "files" associated with this case include tens of thousands of documents.

The most glaring issue with the manner in which Count Fourteen is charged is the fact that it alleges alteration of unidentified "office records" over a nearly four year period of time.  At the hearing on the instant motion, the Government explained to the Court that, in an effort to reduce the number of relevant documents, the Government specifically identified to Defendants 72 of the 504 patient files that were seized from CPC

12

as the files on which the Government will rely during its case in chief at trial.  Moreover, the Government indicated on the record that, with respect to Count Fourteen, the Government's evidence will not rely on unidentified types of "office records," but will instead be limited to the "DMAS-90" time sheets found within the 72 identified patient files.

When determining whether to grant a criminal defendant's motion for a bill of particulars, the government's disclosures during discovery are clearly relevant to the Court's exercise of its discretion to grant such a motion.  Modi, 197 F. Supp. 2d at 530.  Here, the Government has both greatly reduced the number of relevant patient files and has limited the relevant evidence to a single type of allegedly false document: DMAS-90 time sheets.  However, notwithstanding the Government's good-faith actions to reduce the pool of relevant documents, both parties represented at the hearing that there are likely "thousands" of DMAS-90 time sheets in the 72 patient files at issue, as these time sheets were filled out for each patient, sometimes on a weekly basis, and some of the patient files cover the entire period of almost four years set forth in Count Fourteen.

Based on this Court's questioning of counsel at the hearing on the motion for a bill of particulars, it is clear to the Court that Mr. Perry's motion has merit.  The Government has acknowledged that the falsification/alteration charged in Count

Fourteen took different forms, including adding or changing information on previously created DMAS-90 time sheets, or creating an entirely new falsified timesheet to replace a previously created DMAS-90. Such differing forms of alteration/ falsification will undoubtedly make it difficult for the defense to predict, in advance of trial, which of many thousands of documents the Government will seek to prove were altered or falsified. Adding to such difficulty, it appears that the DMAS-90s included in any given patient file may have been prepared by several different individuals that provided care to such patient, and differing preparers may have differing methods of completing (or altering) such forms. Moreover, the Government has acknowledged that even its witnesses will have difficulty identifying which DMAS-90s were falsified because many of such witnesses participated in the alteration or falsification of "hundreds and hundreds" of DMAS-90s covering a several year period.

Accordingly, without further particularization, Defendants will be left to sift through thousands of DMAS-90s contained in 72 patient files covering a nearly four-year period with limited, if any, ability to reasonably identify which documents the Government will attempt to prove false at trial. As noted at the hearing, to the extent the defense seeks to call a handwriting expert, or seeks to cross check the relevant time-

14

sheets against other CPC records in an effort to defend the authenticity/accuracy of such documents, the thousands of potentially falsified documents create a herculean task for the defense. The instant scenario therefore appears even more likely to result in "unfair surprise" at trial than the scenarios faced by the courts in Sampson and Bortnovsky. Moreover, the Government's admission that its own witnesses might have difficulty identifying the falsified/altered documents underscores the need for further particularization to the extent that the Government seeks to introduce altered or falsified documents at trial to prove the Defendants' guilt as to Count Fourteen. Accordingly, after considering the nature of the charge set forth in Count Fourteen, and the facts of this case, including disclosures made during discovery, the Court finds that the Government must provide more particularity than is currently provided through the identification of "thousands" of DMAS-90s that may, or may not, have been altered or falsified.[5]

---

[5] Based on the Government's statements at the motions hearing, it appears that, at trial, "the most crucial testimony in the [G]overnment's conspiracy case" may be the testimony of former CPC employees indicating that Defendants "directed the [large-scale] falsification of files leading up to the [Medicaid] audits," as contrasted with testimony demonstrating the "the truth or falsity of any particular files." United States v. Younes, 194 F. App'x 302, 310 (6th Cir. 2006) (emphasis added). To the extent that, beyond the conspiracy count, the superseding indictment separately charges the falsification or alteration of DMAS-90s in Count Fourteen, for all the reasons discussed above, this Court will require the Government to

The Defendant's joint motion for a bill of particulars is therefore **GRANTED**, and the Government is **ORDERED** to identify to counsel for both remaining Defendants the falsified/forged/ altered DMAS-90s that the Government will, or may, rely on at trial as evidence of Defendants' guilt as to Count Fourteen of the superseding indictment. The Government should identify such DMAS-90s to counsel for both remaining defendants, no later than July 23, 2014. The timing of such disclosure should both allow the Government sufficient time to review the relevant DMAS-90s with its witnesses, and allow sufficient time for Defendants to hire any responsive experts (if necessary). To the extent that, after such date, the Government identifies one or more additional altered or falsified DMAS-90s which it will, or may, rely on at trial with respect to Count Fourteen, the Government should immediately notify defense counsel.

### III. Discussion – Motion to Disqualify

The Government has filed a motion seeking to disqualify Mr. Perry's lawyers, including Mr. Broughton, Mr. Davis, and the entire Williams Mullen law firm. ECF No. 80. The Government

identify the altered/forged/falsified documents on which it will rely at trial. However, to the extent the Government's evidence in support of its conspiracy count intends to rely on broader testimony asserting the mass falsification of CPC patient files, without necessarily identifying the truth or falsity of any particular file, the defense has suggested that it expects to challenge the admissibility of such evidence. This opinion in no way addresses such separate issue, and if the admissibility of the Government's evidence is to be challenged, defense counsel is expected to file a motion in limine on this issue well in advance of trial so that it can be completely briefed.

asserts that Mr. Perry's April 2014 complaint to local authorities about embezzlement allegedly committed by former CPC employees was actually an effort to tamper with witnesses who will be called to testify against Perry at trial. Although Mr. Perry has not been formally charged with witness tampering, the Government contends that Perry's 2014 conduct is evidence of his "guilty knowledge" as to the fraud crimes that are charged in the superseding indictment. The Government further argues that, because defense counsel provided Mr. Perry advice regarding the 2014 complaint, counsel "injected" themselves into the fact pattern of this case, are necessary and likely adverse witnesses to Mr. Perry, and that based on such facts, the entire Williams Mullen law firm should be disqualified.

Mr. Perry counters by arguing that defense counsel's testimony is not necessary at trial, that such testimony is not in dispute, and that it is subject to stipulation. Moreover, defense counsel represents that the defense strategy does not require defense counsel to testify on behalf of Mr. Perry at trial, and that even if defense counsel were called as a witness by the Government, any such testimony would only corroborate Mr. Perry, and thus it will not be "adverse" to Mr. Perry's interests.

## A. Ethical Standard

The standard governing disqualification based on the potential that an attorney will be called on to testify as a fact witness at trial is grounded in counsel's ethical duties to the client, as well as counsel's ethical duties to the legal profession as a whole.  The Local Rules of the United States District Court for the Eastern District of Virginia state that "the ethical standards relating to the practice of law in criminal cases in this Court shall be Section II of Part Six of the Rules of the Virginia Supreme Court as it may be amended or superseded from time to time."  E.D. Va. Loc. Crim. R. 57.4(I). Such cross-reference to the Virginia Rules of Professional Conduct results in Rule 3.7, titled "Lawyer as Witness," being the guiding ethical standard for the analysis of the pending motion to disqualify counsel.  Va. Rule Prof'l Conduct 3.7. Such Rule is commonly referred to as the "witness-advocate rule."

### i. Analysis of Virginia Rule 3.7

In order to properly interpret the current version of Virginia's witness-advocate rule, Rule 3.7, one must first examine both the predecessor Virginia Model Code of Professional Responsibility, and Rule 3.7 of the ABA Model Rules of Professional Conduct on which the current Virginia Rule 3.7 was

based.[6] Prior to Virginia's adoption of Rule 3.7, which took effect on January 1, 2000, a Virginia lawyer's conduct was governed by the Virginia Code of Professional Responsibility. Relevant here are former Disciplinary Rules 5-101 and 5-102, which provide as follows:

> **DR 5-101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.** –
>
> (A) A lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client may be affected by his own financial, business, property, or personal interests, except with the consent of his client after full and adequate disclosure under the circumstances.
>
> (B) A lawyer <u>shall not accept employment</u> in contemplated or pending litigation <u>if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness</u>, except that he may undertake the employment and he or a lawyer in his firm may testify:
>
> > (1) If the testimony will relate solely to an uncontested matter or to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
> >
> > (2) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
> >
> > (3) As to any matter, if refusal would work a substantial hardship on the client because of the

---

[6] Although each State Bar adopts its own ethical rules, many states, including Virginia, previously borrowed heavily from the former ABA Model Code of Professional Responsibility (listed in the form of Disciplinary Rules ("DR")), and the more recent ABA Model Rules of Professional Conduct.

distinctive value of the lawyer or his firm as counsel in the particular case.

**DR 5-102.   Withdrawal as Counsel When the Lawyer Becomes a Witness. –**

(A) If, <u>after undertaking employment</u> in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm <u>ought to be called as a witness on behalf of his client</u>, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (3).

(B) If, <u>after undertaking employment</u> in contemplated or pending litigation, a lawyer learns or it is obvious that <u>he or a lawyer in his firm may be called as a witness other than on behalf of his client</u>, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Rules of the Supreme Ct. of Va. Pt. 6, § II Canon 5 (1999) (emphasis added). Virginia subsequently overhauled its Code of Professional Responsibility, and adopted a new version of the witness advocate rule, drawing heavily from the ABA's Model Rules of Professional Conduct. The relevant ABA Model Rule states as follows:

**Rule 3.7 Lawyer As Witness**

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.

> (b) A lawyer may act as advocate in a trial in which
> another lawyer in the lawyer's firm is likely to be
> called as a witness unless precluded from doing so by
> Rule 1.7 or Rule 1.9.

ABA Model Rule of Professional Conduct 3.7.   Largely adopting

the ABA Model Rule, Virginia Rule 3.7, as currently in force,

provides as follows:

### Rule 3.7. Lawyer As Witness

> (a) A lawyer shall not act as an advocate in an
> adversarial proceeding in which the lawyer is likely
> to be a necessary witness except where:
>    (1) the testimony relates to an uncontested issue;
>    (2) the testimony relates to the nature and value of
>    legal services rendered in the case; or
>    (3) disqualification of the lawyer would work
>    substantial hardship on the client.
>
> (b) If, after undertaking employment in contemplated
> or pending litigation, a lawyer learns or it is
> obvious that the lawyer may be called as a witness
> other than on behalf of the client, the lawyer may
> continue the representation until it is apparent that
> the testimony is or may be prejudicial to the client.
>
> (c) A lawyer may act as advocate in an adversarial
> proceeding in which another lawyer in the lawyer's
> firm is likely to be called as witness unless
> precluded from doing so by Rule 1.7 or 1.9.

Va. Rule Prof'l Conduct 3.7.

Critical to the proper interpretation of Virginia Rule 3.7

is the fact that, unlike many jurisdictions, Virginia did not

fully transition from the witness advocate rule as set forth in

the prior ABA Model Code of Professional Responsibility to the

new Rule 3.7 as modeled by the ABA's Rules of Professional

Conduct.   Rather, Virginia retained a vestige of the former
disciplinary rules when it retained, in large part, DR 5-102(B).
Comparing the text of <u>Virginia</u> Rule 3.7 with the ABA Model Rule,
subpart (a) of the Virginia Rule is substantially similar to ABA
Model Rule 3.7 subpart (a), although the Virginia Rule applies
not just to trials but also to adversarial proceedings.   Subpart
(b) of the Virginia Rule is not found in the ABA Model Rule, but
is instead a modified version of DR 5-102(B).   Subpart (c) of
the Virginia Rule is substantially similar to subpart (b) of the
ABA Model Rule, again expanding its application from trials to
include adversarial proceedings.[7]

In order to determine the effect of Virginia's retention of
a vestige of the former Code of Professional Responsibility, it
is helpful to begin with an analysis of the prior Code.   DR 5-
101(B) generally prevented a lawyer from <u>accepting employment</u> in
contemplated or pending litigation when that lawyer "ought to be
called" as a witness.   Importantly, the text of DR 5-101(B) does
not differentiate as to which party will later have the need to
call a lawyer to testify as a witness, but instead appears to

---

[7] Although not directly relevant to the instant analysis, Virginia's
adoption of the language set forth in ABA Model Rule 3.7(b),
redesignated by Virginia as 3.7(c), is a substantial change from the
prior ethical rules that generally barred <u>an entire law firm</u> from
continuing representation if an individual lawyer at such firm was
needed to testify at trial.   Both the ABA Model Rule and Virginia Rule
3.7 expressly allow a law firm to continue its representation when an
individual lawyer from such firm will testify at trial, as long as
there is not a conflict of interest between the testifying lawyer and
the client.  Va. Rules Prof'l Conduct 3.7(c), 1.7, 1.9, 1.10.

apply to all pre-engagement scenarios when a lawyer recognizes a need to testify for any party in contemplated or pending litigation.

In contrast to DR 5-101(B), DR 5-102 governed a lawyer's discovery of an apparent need to testify when such discovery was made after a lawyer accepted employment. Also critically different from DR 5-101(B), DR 5-102 did not provide one collective rule that was applicable irrespective of which party would likely call the lawyer as a witness, but instead provided one rule applicable only to situations where the lawyer would testify "on behalf of his client," DR 5-102(A), and a second rule applicable where the lawyer would be called as a witness "other than on behalf of his client," DR 5-102(B).

When the ABA adopted Model Rule 3.7, it replaced DR 5-101(B) (pre-engagement rule) and DR 5-102 (post-engagement rule that delineated different guidelines depending on which party would be calling the lawyer as a witness) with a single rule. Such single Model Rule is not only applicable to all engagements irrespective of the timing of the discovery of the apparent need to testify, but it is also applicable to all situations where a lawyer is a necessary witness regardless of which party will call the lawyer as a witness.

As indicated above, although Virginia adopted, with only slight modification, the ABA's new facially all inclusive single

23

rule as set forth in ABA Model Rule 3.7(a), Virginia retained a vestige of its old rule, which applies only when two criteria are satisfied: (1) a lawyer's discovery of the need to testify occurs _after_ the lawyer undertakes employment; and (2) the lawyer will (or may) be called on to testify "other than on behalf of the client."   Va. Rule Prof'l Conduct 3.7(b).   When interpreting the scope of current Virginia Rules 3.7(a) and 3.7(b), it appears that, when read together, Rule 3.7(a) applies in all situations except when the dual requirements of Va. Rule 3.7(b) are satisfied.   In the latter scenario, Rule 3.7(b) controls.

Supporting the above textual analysis, the "Commentary" that follows Virginia Rule 3.7, which was authored by the Virginia Standing Committee on Legal Ethics, states as follows: "[T]he Committee incorporated the language of DR 5-102(B) as paragraph (b) to give the Rule additional flexibility."   Va. Rule Prof'l Conduct 3.7, Committee Commentary.   Such statement, albeit brief, clearly establishes both that: (1) the retention of a vestige of Virginia's former ethical rules was intentional; and (2) that the goal for such retention was to create a rule that is more flexible than the ABA Model Rule.   Although the Committee comment does not provide a detailed explanation as to the justifications for retaining language from DR 5-102(B), the retention of such language appears to be supported by the well-

documented concern that a motion to disqualify opposing counsel
is subject to abuse, as it can be used solely as a tactical
weapon. See Adelman v. Kernbach, 43 Va. Cir. 544, 549 (Norfolk
1997) (indicating that the prejudice requirement included in DR
5-102(B) "guards against parties filing motions merely to obtain
a tactical advantage") (citations omitted); Personalized Mass
Media Corp. v. Weather Channel, Inc., 899 F. Supp. 239, 242-43
(E.D. Va. 1995) (indicating that "[m]otions for disqualification
under DR 5-102(B) . . . are subject to abuse," that there is a
"real risk that disqualification will be sought for tactical
advantage only and not because of the ethical considerations on
which the witness-advocate rule is based," and disqualification
under DR 5-102(B) therefore requires, among other things, a
showing that counsel's testimony "is or may be prejudicial to
the client whose lawyer is to be called as a witness by the
adverse party"); Richard E. Flamm, Lawyer Disqualification:
Disqualification of Attorneys and Law Firms 233-34 (2d ed. 2014)
("[S]everal courts have made it clear that the advocate-witness
rule was not designed to permit a party to call an opposing
attorney as a witness for the purpose of disqualifying him, that
they will not tolerate attempts to invoke the rule for such a
purpose; and that, when a lawyer is to be called other than on
behalf of his own client, the court must take pains to ascertain
whether the challenged lawyer's testimony is truly necessary, or

merely a fabrication of [the] client's adversary."); see also Va. Rule Prof'l Conduct 1.7, Comment [9] (indicating that objections raised by opposing parties regarding conflicts of interest "should be viewed with caution" as they are subject to misuse).

In addition to the above, although there appears to be limited case law from state or federal courts analyzing the interplay between Virginia Rule 3.7(a) and 3.7(b), one appellate decision from Virginia arguably recognizes that Virginia Rule 3.7(b) is an alternative to the otherwise broad applicability of Virginia Rule 3.7(a), stating as follows:

> Virginia Rule of Professional Conduct 3.7 provides that "a lawyer should not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness." Teleguz v. Commonwealth, 273 Va. 458, 490 (2007). This rule also provides, however, that "[i]f, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client." Va. R. of Prof'l Conduct 3.7(b).

Campbell v. Commonwealth, No. 269-12-1, 2012 WL 6571281, at *2 (Va. App. Dec. 18, 2012) (emphasis added). Lending further support for this Court's textual analysis of Virginia Rule 3.7, one commentator examining the state to state differences in Rule 3.7 has noted as follows: "Virginia incorporates language from DR 5-102(B) of the ABA Model Code of Professional Responsibility

26

to deal with situations in which a lawyer learns that he or she may be called as a witness 'other than on behalf of the client' after accepting the representation." Stephen Gillers et al., Regulation of Lawyers: Statutes and Standards 350 (Concise ed. 2014) (emphasis added).

For the reasons discussed above, Virginia Rule 3.7, when read in its entirety, appears to be best interpreted as providing one ethical rule that is generally applicable in most cases where a lawyer learns that his testimony is "likely to be necessary" at a trial or adversarial proceeding. Va. Rule Prof'l Conduct 3.7(a). However, in the defined circumstances where a lawyer discovers, during representation that he is likely to be called as a witness by the opposition, the alternative rule set forth in 3.7(b) applies. Id. at 3.7(b). Here, as the Government's motion implicates both whether defense counsel are "necessary" witnesses for the defense, and whether defense counsel will be called at trial as witnesses for the Government, this Court will separately analyze Rules 3.7(a) and 3.7(b). Before doing so, the Court reviews both the justifications for the witness advocate rule and the constitutional right to counsel of choice in criminal proceedings.

### ii. Justification for Witness Advocate Rule

Notwithstanding the significant revisions of Virginia's ethical rules taking effect in 2000, cases decided prior to Virginia's adoption of Rule 3.7 remain instructive, particularly when considering the reasons underpinning the witness rule. In Personalized Mass Media, a case decided by another judge of this Court under the predecessor ethical rules, the Court explained the witness advocate rule as follows:

> The rule derives from the fundamental fact that the roles of advocate and witness are inconsistent, it being the function of the advocate to argue the cause of another and the role of a witness to state facts objectively. In recognition of this fundamental difference in the roles of witness and advocate, the rule serves as a "prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole."

Personalized Mass Media, 899 F. Supp. at 242 (quoting Estate of Andrews v. United States, 804 F. Supp. 820, 823 (E.D. Va. 1992)). Similarly, the commentary to Virginia Rule 3.7 provides the following explanation:

> Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and client. The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof. . . .   Whether the opposing

28

> party is likely to suffer prejudice depends on the
> nature of the case, the importance and probable tenor
> of the lawyer's testimony, and the probability that
> the lawyer's testimony will conflict with that of
> other witnesses. . . .

Va. Rule of Prof'l Conduct 3.7, Comments [1], [2], [4]. See
Flamm, supra, 224-31 (discussing "a number of very different
reasons" offered for the witness advocate rule by various courts
over the years, labeling as "[p]erhaps the most compelling
reason" the possibility that the factfinder will confuse what an
attorney states "in her witness capacity" with what she states
"in her role as advocate," and further noting that some early
rationales for the witness advocate rule, including the
"perceived need to preserve the integrity of the judicial
process by avoiding even the appearance" that counsel may
distort the truth to benefit his or her client, have more
recently been criticized as insufficient to warrant "the drastic
remedy of disqualifying counsel"). Because the witness-advocate
rule protects not only the interests of the client, but also the
adverse party and the legal system as a whole, a party is
generally prohibited from "waiving" its application. Premium
Products, Inc. v. Pro Performance Sports, LLC, --F. Supp. 2d--,
2014 WL 644398, at *5 (E.D. Va. Feb. 19, 2014).

Having outlined some of the reasons that courts generally
disfavor permitting counsel to perform dual roles in the same
adversarial proceeding, this Court must separately consider the

contours of a litigant's right to counsel of his or her choice, because "[e]ven if there is risk of . . . prejudice" resulting from a court allowing a lawyer to act in a dual role, "in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client." Va. Rule of Prof'l Conduct 3.7, Comments [1], [2], [4]. As discussed below, the interests at stake in a criminal case unquestionably have a constitutional dimension, and therefore, a motion filed by the government seeking to disqualify a criminal defendant's chosen retained attorney is not to be taken lightly.

## B. Constitutional Right to Counsel of Choice

### i. Right Rooted in the Sixth Amendment

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend VI. As the Supreme Court of the United States ("Supreme Court") has long-recognized, when an individual is charged with a criminal offense he must be afforded a "fair opportunity to secure counsel of his own choice." Powell v. State of Alabama, 287 U.S. 45, 53 (1932). This is so because "the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment." Wheat v. United States, 486 U.S. 153, 159 (1988).

However, because the "essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers," the right to counsel of one's own choosing is "circumscribed in several important respects." Id. These include: (1) a chosen attorney must be licensed to practice; (2) a defendant cannot insist on representation "by an attorney he cannot afford or who for other reasons declines to represent the defendant"; and (3) a defendant cannot insist on an attorney who has an "ongoing relationship with an opposing party," to include the government, nor may he insist on a lawyer who has ethical obligations to other defendants charged in the same conspiracy, because even if all such defendants seek to waive any ethical conflicts, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 159-60.

Although a criminal defendant's right to counsel of choice is not unlimited, the Supreme Court has recently clarified the constitutional underpinnings of such right and expressly recognized the severe consequences flowing from the improper deprivation of that right. In United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), the Court reiterated the fact that "an

element" of the constitutional right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him." Id. at 144 (citing Wheat, 486 U.S. at 159). In explaining the breadth of such right, and the consequences for its violation, the Court explained that while the Due Process clause of the Constitution guarantees a fair trial, and the provisions in the Sixth Amendment (including the right to effective counsel) help define the basic elements of a fair trial, "[t]he right to select counsel of one's choice . . . has never been derived from the Sixth Amendment's purpose of ensuring a fair trial." Id. at 146-47. Rather, the right to counsel of choice "has been regarded as the root meaning of the constitutional guarantee," and thus, if such right is wrongly denied, "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." Id. at 147-48 (citing Wheat 486 U.S. at 149; Andersen v. Treat, 172 U.S. 24 (1898)); see United States v. Basham, 561 F.3d 302, 324-25 (4th Cir. 2009) (clarifying that while an indigent criminal defendant only has the constitutional right to the effective assistance of counsel, a defendant with means to hire an attorney has the additional constitutional right to "counsel of [his] own choosing"). Stated differently, deprivation of the right to counsel of choice for a defendant with means to hire an attorney "is 'complete' when the defendant is erroneously

32

prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." Gonzalez-Lopez, 548 U.S. at 148. Because the erroneous deprivation of counsel of choice "pervades the entire trial," and the consequences are "'necessarily unquantifiable and indeterminate,'" such deprivation is a "structural error" warranting a new trial. Id. at 150 (quoting Sullivan v. Louisiana, 508 U.S. 275, 282 (1993)); see United States v. Davila, 133 S. Ct. 2139, 2149 (2013) (discussing the "'very limited class of [structural] errors' that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole," which include improper "denial of counsel of choice" (quoting United States v. Marcus, 560 U.S. 258, 263 (2010))).

### ii. Balancing of Rights

Notwithstanding the fact that the right to counsel of choice is rooted in the Sixth Amendment, a trial court maintains "'wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar.'" Hyatt v. Branker, 569 F.3d 162, 172 (4th Cir. 2009) (quoting Gonzalez-Lopez, 548 U.S. at 152). Accordingly, as explained by the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), while there is "'a presumption in favor of [a defendant's] counsel of choice,'" a conflict of

interest remains an adequate basis on which to disqualify a defendant's chosen attorney because the judiciary has an "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" Basham, 561 F.3d at 323 (quoting Wheat, 486 U.S. at 160).

The decision to disqualify a criminal defendant's counsel of choice is "a serious matter and must be decided on a case-by-case basis." United States v. Franklin, 177 F. Supp. 2d 459, 464 (E.D. Va. 2001) (citing Tessier v. Plastic Surgery Specialists, Inc., 731 F. Supp. 724, 729 (E.D. Va. 1990)); see United States v. Collins, 920 F.2d 619, 625 (10th Cir. 1990) ("'Attorneys are not fungible;' often 'the most important decision a defendant makes in shaping his defense is his selection of an attorney.'" (quoting United States v. Laura, 607 F.2d 52, 56 (3d Cir. 1979))). Moreover, even in a civil case, where Sixth Amendment protections are not implicated, "the disqualification of a party's chosen counsel is a serious matter which cannot be based on imagined scenarios of conflict." Tessier, 731 F. Supp. at 729 (citing Richmond Hilton Associates v. City of Richmond, 690 F.2d 1086, 1089 (4th Cir. 1982)). Rather, there must be an "actual conflict of interest" or a "likely" conflict. Richmond Hilton, 690 F.2d at 1089. Because a motion seeking to disqualify counsel can be used improperly

34

"for purely strategic purposes," the moving party "bears a 'high standard of proof.'" Tessier, 731 F. Supp. at 729 (quoting Government of India v. Cook Industries Inc., 569 F.2d 737, 739 (2d Cir. 1978)). Accordingly, when faced with a motion seeking disqualification of a retained attorney, a district court must balance the interests of the public, and of the legal profession, against: (1) in a criminal case, the defendant's Sixth Amendment right to counsel of choice; or (2) in a civil case, "'the fundamental principle that a party ought to be represented by its counsel of choice if that is at all possible.'" Ford Motor Co. v. National Indem. Co., No. 3:12cv839, 2013 WL 4498698, at *4 (E.D. Va. Aug. 21, 2013) (quoting Personalized Mass Media, 899 F. Supp. at 242).

In Aetna Casualty & Surety Co. v. United States, 570 F.2d 1197 (4th Cir. 1978), a civil case, the Fourth Circuit's opinion highlights the importance of a district court carefully evaluating, on a case by case basis, the likelihood of an ethical conflict arising at trial. In such case, the Fourth Circuit held that the district court erred by disqualifying defense counsel—the Department of Justice and United States Attorney—based on a purported conflict of interest between defendants. Id. at 1200-01. The Fourth Circuit explained that the district court's hypothesis about possible scenarios that could arise wherein one defendant could exculpate himself by

35

inculpating his codefendants was "based solely upon conjecture," and "ignored the representation of Government counsel, <u>which was accepted by the court</u>" that there was "no dispute" among the defendants with respect to the relevant facts.    <u>Id.</u> at 1201 (emphasis added).    In reaching such conclusion, the Fourth Circuit stated that it was in "full accord" with the following comments made by the Connecticut Bar Association as amici curiae in <u>International Electronics Corp. v. Flanzer</u>, 527 F.2d 1288 (2d Cir. 1975):

> It behooves this court, therefore, while mindful of the existing [Disciplinary Rules of the] Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.

<u>Aetna Casualty</u>, 570 F.2d at 1202 (quoting <u>International Electronics</u>, 527 F.2d at 1293).

In addition to the above, it must be noted that in seeking to define the legal test governing motions to disqualify opposing counsel, several prior opinions of this Court have relied, at least in part, on the following statement made by the Fourth Circuit:

> In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances "with hair-splitting nicety" but, in the proper exercise of its supervisory power over the

members of the bar and with a view of preventing "the appearance of impropriety," it is to resolve all doubts in favor of disqualification.

United States v. Clarkson, 567 F.2d 270, 273 n.3 (4th Cir. 1977) (quoting Gas-A-Tron of Arizona v. Union Oil Co. of California, 534 F.2d 1322, 1324-25 (9th Cir. 1976)).  The above quoted statement indicating that "all doubts" should be resolved in favor of disqualification, however, is arguably dicta as it does not appear in an opinion reviewing the propriety of a disqualification order, but instead appears in an opinion affirming a district court's "judgment of contempt" flowing from a violation of a previously entered disqualification order.  Id. at 271-73.  Notably, the Clarkson opinion expressly states that the district court's prior disqualification order was entered "without objection," and further notes that the prior disqualification order was based on "an obvious conflict of interest."  Id. at 272-73.  Additionally, and most importantly, the reference to erring on the side of disqualification not only appears in a footnote, but was made prior to the Supreme Court's decisions in Wheat and Gonzalez-Lopez, which lend further clarity to the depth of the Sixth Amendment right to retain counsel of choice.  See Sanford v. Commonwealth of Virginia, 687 F. Supp. 2d 591, 602-03 (E.D. Va. 2009) (noting that "[w]hile, as the Fourth Circuit explained in Clarkson, the assessment to be made in a disqualification motion cannot be made with 'hair-

37

splitting nicety,' it is nonetheless true that the asserted
conflict must be a real one and not a hypothetical one or a
fanciful one," and that "some stronger indicator than judicial
intuition or surmise on the part of opposing counsel is
necessary to warrant the drastic step of disqualification of
counsel") (internal quotation marks and citations omitted)
(emphasis added). Moreover, the Fourth Circuit's footnote
statement in Clarkson, which has never been repeated by the
Fourth Circuit, is expressly directed at "determining whether to
disqualify counsel for conflict of interest," not determining
whether disqualification is necessary in a criminal case due to
the potential that counsel will be called as a fact witness at
trial. Clarkson, 567 F.2d at 273 n.3; cf. United States v.
Urutyan, 564 F.3d 679, 686-87 (4th Cir. 2009) (noting in a more
recent conflict of interest case that the presumption in favor
of a criminal defendant's counsel of choice, as recognized in
Wheat, can be overcome by demonstrating either an "actual
conflict" or a "serious potential for conflict," without
mentioning that a court should err on the side of
disqualification) (internal quotation marks and citations
omitted). Finally, subsequent to Clarkson, numerous states,
including Virginia, have overhauled their ethical guidelines and
adopted a rule that appears to create a higher burden in order
to disqualify counsel. See Cannon Airways, Inc. v. Franklin

Holdings Corp., 669 F. Supp. 96, 99-100 (D. Del. 1987) (citing to various federal and state cases, as well as manuals/handbooks on professional responsibility, and concluding that the "language of [Delaware] Rule 3.7(a) is more restrictive than the . . . language of [Delaware] DR 5-101(B) and DR 5-102(A)" and that a moving party is therefore required "to bear a higher burden" to demonstrate the propriety of disqualification); Flamm, supra, 217-18 (indicating that ABA Model Rule 3.7 was designed to "minimize the use of the advocate-witness rule as a tactical weapon, and ensure that a litigant's choice of trial counsel would not be lightly disturbed," and that although "[t]he wording of DR 5-102 and Model Rule 3.7 is similar, . . . the Model Rule places a higher burden" on the party moving for disqualification).

In contrast to Clarkson, here, this Court's inquiry is informed by the Supreme Court's opinions in Wheat and Gonzalez-Lopez, to include the direction in Wheat that a district court "must recognize a presumption in favor of [a defendant's] counsel of choice." Wheat, 486 U.S. at 164 (emphasis added); see Gonzalez-Lopez, 548 U.S. at 148 n.3 (indicating that it was in Wheat that the Supreme Court "formulated the right to counsel of choice") (emphasis added). Moreover, the facts of this case focus this Court's inquiry on the ethics surrounding the witness advocate rule, not conflict of interest rules, and the fact

pattern before this Court is a far cry from the clear conflict of interest that arose in Clarkson where the defendant attorney, in direct violation of a prior court order, had continued involvement with former tax clients while the government was in the process of interviewing such individuals as potential witnesses against the attorney in a criminal tax fraud case.

Although one may question whether the footnote statement in Clarkson requires this Court to "resolve all doubts" in favor of disqualification when applying the witness advocate rule, this Court acknowledges the wealth of authority from prior opinions of this Court holding that "'the right of one to retain counsel of his choosing is secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.'" Sanford, 687 F. Supp. 2d at 602 (quoting Tessier, 731 F. Supp. at 729). Moreover, the Fourth Circuit recently noted in Urutyan that the "paramount concern is the judiciary's 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" Urutyan, 564 F.3d at 686 (quoting Wheat, 486 U.S. at 160). There is therefore no question that the proper course is to disqualify counsel in the name of upholding compliance with ethical rules when an ethical conflict will undermine, or

seriously threaten to undermine, the integrity of judicial proceedings. That said, this Court's disqualification analysis is mindful of the Fourth Circuit's post-<u>Clarkson</u> direction in <u>Aetna Casualty</u> that federal courts should avoid doing more harm than good through a "mechanical and didactic" application of the ethical rules, <u>Aetna Casualty</u>, 570 F.2d at 1202 (quoting <u>International Electronics</u>, 527 F.2d at 1293), as well as the Fourth Circuit's subsequent statements in <u>Shaffer v. Farm Fresh, Inc.</u>, 966 F.2d 142, 146-47 (4th Cir. 1992), indicating that "in assessing the propriety of disqualifying counsel on 'likely' conflict grounds . . . [t]he <u>drastic nature of disqualification</u> [even in a civil case] requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights to freely choose their counsel." This Court therefore endeavors to carefully weigh the unique facts of this case against the relevant ethical standards, taking into consideration defense counsel's assurances, which cannot be discounted, <u>id.</u> at 147, as well as the prior decisions of this Court, the Fourth Circuit, and the Supreme Court, in a manner that seeks to avoid not seeing the forest for the trees.

Accordingly, as "charged by <u>Wheat</u>" this Court is called upon to "exercise its sound discretion and determine independently whether the continued representation by [defense] counsel impedes the integrity of the proceedings" such that

Perry's chosen counsel should be disqualified. <u>Franklin</u>, 177 F.
Supp. 2d at 464.   Explaining the district court's "broad
discretion" in performing such balancing, the Fourth Circuit has
noted as follows:

> <u>Wheat</u> thus requires a district court to exercise its
> own independent judgment as to whether the proceedings
> are likely to have the requisite integrity if a
> particular lawyer is allowed to represent a party.
> And, it made plain that for this purpose the court
> must have sufficiently broad discretion to rule
> without fear that it is setting itself up for reversal
> on appeal either on right-to-counsel grounds if it
> disqualifies the defendant's chosen lawyer, or on
> ineffective-assistance grounds if it permits conflict-
> infected representation of the defendant.

<u>United States v. Williams</u>, 81 F.3d 1321, 1324 (4th Cir. 1996).
In the end, while this Court must ensure the integrity of the
proceedings, and will demand nothing less of licensed counsel
than strict compliance with the ethical standards of the bar,
contrary to the Government's suggestion at oral argument, "there
is no rule of evidence absolutely excluding the testimony of a
lawyer on behalf of his client." <u>United States  v. Nyman</u>, 649
F.2d 208, 211 (4th Cir. 1980).   Rather, "the question whether an
attorney is competent to testify" turns on application of the
relevant ethical rules and is a matter "committed to the
discretion of the trial court." <u>Id.</u>; <u>see</u> <u>Christensen v. United
States</u>, 90 F.2d 152, 154 (7th Cir. 1937) (noting that there is
not "'a rule of absolute exclusion'" that prevents an attorney
from testifying as a witness and that "'the great majority of

the courts prefer to leave the question to the sound discretion of members of the bar with a threat of scathing reprimand in case of abuse'" (quoting 5 Jones' Commentaries on Evidence (Second Ed.) § 2154, p. 4079)). Stated differently, the witness advocate rule "does not render an attorney incompetent to testify, but merely vests the Court with discretion to determine whether counsel may appear as a witness without withdrawing from the case." Mercury Vapor Processing Technologies, Inc. v. Village of Riverdale, 545 F. Supp. 2d 783, 788 (N.D. Ill. 2008).

As noted at the motions hearing, the balancing tasked to this Court is necessarily difficult at this stage in the proceedings because the Court is required to prognosticate how complex ethical principles will apply in light of the evidence to be presented at trial, yet the Court lacks access to the bulk of the evidence to be presented at trial. It is plain that this Court begins with the settled "presumption in favor of [Perry's] counsel of choice," Wheat, 486 U.S. at 164, and the Court should "not interfere with that relationship" unless the government has met the "high standard of proof to show that disqualification is warranted" in light of the governing ethical standards and the "specific circumstances of the representation," Franklin, 177 F. Supp. 2d at 463-64 (quotation marks and citations omitted) (emphasis added); see United States v. Gearhart, 576 F.3d 459, 464 (7th Cir. 2009) (noting that, in light of the Sixth

Amendment right to counsel of choice, "disqualification of defense counsel should be a measure of last resort" (citing United States v. Diozzi, 807 F.2d 10, 12 (1st Cir. 1986)). Although this Court's analysis will be conducted through a careful step by step consideration of Rule 3.7, the Court's task appears best summed up as "balancing the individual rights and interests of the defendant to his counsel of choice with maintaining the integrity of the proceedings." Franklin, 177 F. Supp. 2d at 464.

### C. Application of Rule 3.7(a)

**Lawyer As Witness**

(a) A lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where:
   (1) the testimony relates to an uncontested issue;
   (2) the testimony relates to the nature and value of legal services rendered in the case; or
   (3) disqualification of the lawyer would work substantial hardship on the client.

Va. Rule Prof'l Conduct 3.7(a).

### i. Court's Case Specific Evaluation as to Whether Defense Counsel is "Likely to be a Necessary Witness" on Behalf of the Defense

The first question at issue based on the facts and circumstances of this case, is whether Mr. Broughton, or Mr. Davis, is "likely to be a necessary witness" on behalf of the defense. The defense asserts that counsel's testimony is <u>not</u>

necessary to Mr. Perry's case,[8] and further represents that "Mr. Perry will not call defense counsel as a witness." Perry's Opp'n to Disqual. 10 n.3, ECF No. 85. After considering the parties' briefs in advance of the hearing on the instant motion, this Court seriously questioned such assertion, primarily because it appeared to the Court that defense counsel's testimony was necessary to Mr. Perry's case since it would corroborate, and thus substantially support the truthfulness of, both the testimony of former CPC CFO James Sears, and Mr. Perry himself (if he chooses to testify). As analyzed in a subsequent subsection of this Opinion, the Court had much less concern with the suggestion that such testimony was "necessary" to the Government's case. Accordingly, at the motions hearing, this Court repeatedly pressed Perry's counsel in an effort to flesh out the reasoning behind the defense's viewpoint that neither Mr. Broughton nor Mr. Davis is a "necessary" witness for Mr. Perry. As part of such probing inquiry, the Court expressly noted that, assuming no conflict of interest, the current

---

[8] It is undisputed that the purported need for Mr. Perry's counsel to testify in this case did not arise until more than a year after counsel began representing Mr. Perry in this matter. Accordingly, for the reasons outlined in detail above, this Court construes Rule 3.7(a) as governing only whether Mr. Davis or Mr. Broughton is a necessary witness on behalf of Mr. Perry. As to whether Mr. Davis or Mr. Broughton is a necessary witness for the prosecution, such analysis is governed by Rule 3.7(b). However, even assuming arguendo that Rule 3.7(a) governs whether either defense lawyer is a necessary witness for the Government, this Court finds that disqualification is not warranted because defense counsel's testimony is not "necessary" to the Government's case.

45

ethical rules appear to permit one of Mr. Perry's lawyers to stop working on the case in order to serve as a fact witness, while the other continues as trial counsel. Va. Rule Prof'l Conduct 3.7(c). The Court further noted the withdrawing attorney might be permitted to continue assisting with the case until the point of trial. Cf. Ford Motor Co., 2013 WL 4498698, at *7 (noting that the attorney being disqualified "will only be disqualified from acting as a trial advocate, not from assisting in the preparation of the case or even from assisting at trial in a non-advocacy role"). Notwithstanding such comments, the defense maintained its position that neither Mr. Broughton nor Mr. Davis was a "necessary" witness, and the Government maintained its position that not only is Mr. Broughton a necessary witness, but that Mr. Broughton, Mr. Davis, and the entire Williams Mullen law firm should be disqualified.[9]

Although the Court pressed defense counsel for their reasoning, and suggested on the record that the Court was leaning towards disqualifying Mr. Broughton, but not Mr. Davis or Williams Mullen, the Court has since reflected further on both the constitutional presumption in a criminal case and the two-fold argument made by the defense as to this issue. First,

---

[9] The Government appears correct that, if there was a conflict of interest between defense counsel and Mr. Perry, the entire Williams Mullen firm would need to be disqualified. Va. Rule Prof'l Conduct 3.7(c). However, absent a conflict, Rule 3.7(c) expressly allows a law firm to remain in a case when an individual lawyer from such firm must testify at trial.

the defense contends that the entire issue involving Perry's,
and defense counsel's, 2014 conduct is a tangential issue that
has little to do with the charges contained in the superseding
indictment and/or the case the defense intends to mount at
trial.   Defense counsel indicated that if Mr. Perry testifies,
as is anticipated at this time, this issue will likely amount to
"about one percent" of Perry's total testimony, because the 2014
complaint to local police is little more than the continuation
of Perry's consistent position that he is not guilty of the
crimes charged in the indictment and that it was his former
employees that both committed Medicaid fraud and embezzled from
CPC.   The defense persuasively notes that Mr. Perry not only
took this precise position almost a year and a half prior to the
filing of the April 2014 complaint, but that he did so in
writing in December of 2012 when he terminated Vernice Spain and
Sarina Freeman for embezzlement.       Additionally, it appears
undisputed that Mr. Perry informed Vernice Spain and Sarina
Freemen in late 2012 that they were being investigated by the
FBI.   It also appears that Mr. Perry continues to take such
position today, and will take such position before the jury as a
defense to the pending criminal charges.   Accordingly, as argued
by the defense, it is a rather unremarkable point that Mr. Perry
took this same position in his interactions with his lawyers in
2012, 2013, and 2014, ultimately culminating in the April 2014

47

report of embezzlement to local authorities.[10]    Stated
differently, the defense does not contend that the 2014
complaint is not relevant to Mr. Perry's defense at trial, but
instead argues that it is a very minor part of such defense
because all it does is demonstrate that Mr. Perry told his
lawyers in 2014 the same thing that he told them in 2012 (which
is also the same thing that the defense will argue before the
jury)—that former CPC employees, and not Mr. Perry, are guilty
of crimes against Medicaid and CPC.

    Second, the defense contends that to the extent the
Government insists on focusing at trial on Mr. Perry's 2014
conduct, rather than focusing on the evidence directly relevant
to the charged illegal acts, purportedly committed between
January of 2009 and January of 2013, defense counsel is
convinced that the testimony of CFO Sears, which could include
the admission of emails between defense counsel and Mr. Sears,
is sufficient to both rebut the Government's improper
characterization of Mr. Perry's 2014 conduct and to corroborate
Mr. Perry's testimony (if he testifies).   Defense counsel thus

---

[10] Mr. Perry also took such position in late 2012 when his counsel asked
federal prosecutors and agents to investigate an upcoming meeting
between Vernice Spain and another CPC employee.  It is notable that
such request appears to have resulted in at least one of the Assistant
United States Attorneys assigned to this case having some personal
involvement in facts relevant to the pending charges.  However, just
as defense counsel are not "necessary" witnesses based on their
involvement in the post-offense investigation, the federal prosecutors
assigned to this case are not required to withdraw and testify as
"necessary" witnesses based on their involvement in the investigation.

asserts that counsel's testimony would be cumulative and add little to the other evidence that will be presented at trial, and although such testimony is potentially helpful, it is something substantially less than "necessary." See In re Chantilly Constr. Corp., 39 B.R. 466, 473 (E.D. Va. 1984) (indicating that attorney witnesses were not necessary because their testimony would be "cumulative and in some instances redundant" to testimony that could be offered through other individuals that were present at the relevant meetings); Flamm, supra, at 251-55 (indicating that counsel's testimony is typically not deemed "necessary" when "the testimony counsel could give would be cumulative – and therefore duplicative or corroborative – of what other witnesses could testify about" or when "counsel's testimony would be cumulative of the written record"); see also Metropolitan P'ship, Ltd. v. Harris, No 3:06cv522-W, 2007 WL 2733707, at *2 (W.D.N.C. Sept. 17, 2007) (applying North Carolina Rule 3.7(a), which appears to track the ABA Model rule, and concluding that an attorney should only be disqualified under that rule when, among other things, such testimony "cannot be obtained elsewhere" (citing United States v. Dyess, 231 F. Supp. 2d 493, 496 (S.D.W. Va. 2002))).

This Court entered the hearing on the motion to disqualify with serious reservations as to the completeness of defense counsel's evaluation of the "necessity" of at least Mr.

Broughton's testimony in order to "go to bat," so to speak, for Mr. Perry.   However, upon further reflection, both of defense counsel's arguments in response to the Court's queries have substantial sway with the Court.   Although the importance of counsel's compliance with ethical rules cannot be overstated, the Court is of the view that, particularly when operating in a murky pre-trial context, the responsible course is to tread carefully with respect to a ruling that, in effect, would dictate to defense counsel how to try their case.

### ii. Counsel and Client in Best Position

In seeking to evaluate the position of the defense that their testimony is not necessary to Mr. Perry's case, it should go without saying that the Court possesses just a sliver of relevant information regarding: (1) the facts of the Government's case; (2) the facts of Mr. Perry's intended case, should he choose to put on evidence; (3) the role Mr. Broughton has taken in the defense of this case for the last year and a half; and (4) the role Mr. Broughton intends to play at trial. See Wheat, 486 U.S. at 162 (indicating that "[u]nfortunately for all concerned" a district court must resolve questions regarding counsel's ability to represent a criminal defendant within the ethical rules "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass,

darkly"). As recognized by Virginia courts applying the predecessor ethical rules governing whether an attorney "ought to be called" as a witness on behalf of his or her client:

> [T]he attorney and client are in the best position to determine the necessity of counsel's testimony. . . . [I]f it is counsel's and client's best judgment that they can get by without testimony from counsel, then it is certainly not up to defendants to urge upon them a different plan of presentation that would necessitate disqualification.

Adelman, 43 Va. Cir. 546 (quoting Hirst v. Siegfried, 35 Va. Cir. 166, 169-70 (Fairfax County 1994) (alterations in original).

At this stage in the proceedings, there is simply insufficient information before the Court for it to conclude that it should substitute its judgment for that of the defense, and rule that Mr. Broughton's, or Mr. Davis', testimony is "necessary" to the effective and ethical presentation of Mr. Perry's case at trial. To the contrary, the defense has compellingly argued that defense counsel's testimony is only relevant to a matter tangential to the charges in the superseding indictment, and that although counsel could testify on behalf of their client, such testimony would be just a single piece of evidence, among many, demonstrating that Mr. Perry has maintained since late 2012 that his former staffing coordinators are guilty of embezzlement and Medicaid fraud. Moreover, Fourth Circuit precedent suggests that it would be improper to

"ignore[] the representation of [defense] counsel" and, "based solely upon conjecture," conclude that counsel must be disqualified due to the possibility that a hypothetical series of events could occur that would render defense counsel's testimony necessary. Aetna Casualty, 570 F.2d at 1201; see also Hirst, 35 Va. Cir. at 169-70 (discussing "'three reasons why, in good faith disputes, deference should be paid to the judgment of the counsel whose disqualification is sought'": (1) "'the attorney and the client are in the best position to determine the necessity of counsel's testimony'"; (2) "'counsel and client face harsh consequences if counsel continues while possessed of crucial testimony: the lawyers testimony might be inadmissible; counsel might be subject to disciplinary actions for violations of the code'"; and (3) "'if it is counsel's and client's best judgment that they can get by without testimony of counsel, then it is certainly not up to [the opposing party] to urge upon them a different plan of presentation that would necessitate disqualification'" (quoting Borman v. Borman, 393 N.E.2d 847, 857 (Mass. 1979)). Accordingly, even assuming that Mr. Perry "plan[s] to present evidence addressing these areas, at this time, it is not clear to the Court that such evidence could not be provided by sources other than the Attorneys." Adelman, 43 Va. Cir. at 547. This Court therefore finds it imprudent to, based largely on speculation, "dictate the [defendant's] trial

52

strategy" through concluding, over the objections of the
defense, that defense counsel is a "necessary" witness that must
withdraw from representation. Hirst, 35 Va. Cir. at 170; see
Virginia L.E.O. 1455, Mar. 13, 1992 (noting, in a scenario where
the client did not intend to call counsel on her behalf, and
where the lawyer witness's testimony (1) would purportedly be
"cumulative"; (2) is potentially covered by a privilege; and (3)
it did not appear "to be obvious" that counsel ought to testify
on behalf of his client, that counsel may continue in the case,
even if called as a witness by the opposing party, "until it is
apparent that his testimony is or may be prejudicial to [his
client]").

In light of the facts before the Court at this time, and
the parties' explanation as to the relevance of the 2014
conduct, this Court's finding as to the lack of "necessity" of
Mr. Broughton's testimony on behalf of his client is strongly
impacted by the tangential nature of the issue to which defense
counsel possesses relevant factual evidence. The Government, of
course, has every right to choose how to present its case.
However, the Government's contention that Mr. Perry's 2014
conduct, if interpreted in the Government's favor, can
demonstrate "guilty knowledge" of crimes that were committed
more than a year prior does not elevate counsel's testimony
about the advice provided to Mr. Perry to "necessary" status, as

it might in a case where counsel's advice could have the effect of disproving an element of an offense charged in a criminal indictment.

### iii. No True "Advice of Counsel" Defense

In reaching the above conclusion, the Court rejects the Government's contention that disqualification of counsel is always required whenever a defendant intends to reference the advice he received from counsel during trial testimony. This Court acknowledges the existence of an "advice of counsel" legal defense, which is generally raised in cases involving specific intent crimes, whereby a defendant seeks to rely on the "advice of counsel" as a shield from guilt regarding the crimes charged in the indictment. In such a case, a defendant seeks to establish that he or she shared all the relevant facts with counsel, that counsel provided legal advice, and that the defendant reasonably relied on such advice, thus tending to negate the mens rea for the charged specific intent crime. See, e.g., United States v. Powell, 680 F.3d 350, 356 (4th Cir. 2012) ("A defendant may use his reliance on the legal advice of counsel 'to refute the government's proof that [he] intended to commit the offense.'" (quoting United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981))) (alteration in original); United States v. Swafford, 512 F.3d 833, 839 (6th Cir. 2008) (noting that the "partial defense of 'advice of counsel,' . . .

54

disproves the mens rea element of the offense, by showing that
[the defendant] had spoken with a lawyer from the same firm
representing him at trial about the legality" of his actions)[11];
see also United States v. Matsa, No. 2:09cr297, 2010 WL 4117548,
at *2 (S.D. Ohio Oct. 19, 2010) (disqualifying counsel in a case
where it was likely that the defendant would assert an advice of
counsel defense associated with a letter drafted by his counsel
"that resulted in a specific count in the indictment") (emphasis
added).    When a defendant establishes a proper evidentiary
foundation for such an "advice-of-counsel defense" at a trial,
the court will instruct the jury on the law governing such
defense.   See Powell, 680 F.3d at 356-57.

     Here, the traditional "advice of counsel" defense is simply
not at issue.   Notably, even if Mr. Perry testifies about advice
he received from defense counsel: (1) his reliance on such
advice is not an affirmative defense to the mens rea element of
any crime charged; (2) defense counsel's advice/conduct does not
form the factual predicate for any crime charged in the

---

[11] Although the Government cites Swafford in support of its contention
that Perry's counsel should be disqualified, not only did that case
involve the potential for an "advice of counsel" defense that could
have negated an element of the offense charged in the indictment, but
the law firm representing the defendant "refused to allow the
defendant to call the lawyer who allegedly provided the advice,"
revealing a direct conflict of loyalties to the firm and the client.
Here, Perry's lawyers are willing to stipulate to "any true fact"
relating to the 2014 conduct and their advice to Perry, and the nearly
identical affidavits before the Court submitted by Mr. Perry and Mr.
Broughton suggest a unity of position and lack of questions regarding
conflicting loyalties.

superseding indictment; and (3) Mr. Perry will not request, or receive, a jury instruction outlining the law behind the "advice-of-counsel defense" because the facts of this case simply do not implicate such defense. Rather, here, the Government first sought to revoke Mr. Perry's bond, and then sought disqualification of the entire law firm representing Mr. Perry, based on activities occurring more than a year after the end of the criminal conduct charged in the superseding indictment. In defense to these uncharged accusations of Mr. Perry's recent misdeeds, something the Government intends to pursue at trial not because it is an element of any crime charged, or a defense to any crime charged, but instead because the Government views such evidence as strengthening its case, Perry seeks to demonstrate, consistent with the presumption that he is innocent of the crimes charged, that there is an innocent explanation for his 2014 conduct. As part of such demonstration, and likely dependent on how the Government presents its case in chief, Perry may testify about advice he received from his lawyers associated with what appear to be largely undisputed, and largely unremarkable, facts: (1) that Mr. Perry consistently maintained in 2012, 2013, and 2014, as he will maintain at trial, that he is innocent, and that former CPC employees stole money from CPC and the federal government; and (2) based on Mr. Perry's assertion of innocence coupled with

CPC's business records showing atypical "bonus" checks being issued to former CPC employees in July of 2012, defense counsel was intimately involved in the 2014 complaint process and advised Mr. Perry that he should file such complaint. The Court, therefore, finds that disqualification is not warranted merely because Mr. Perry may reference at trial advice he received from his lawyers.

### iv. Consultation with Independent Counsel

Notwithstanding the Court's conclusion that defense counsel is not "likely to be a necessary witness" on behalf of Mr. Perry, as is well-established across the numerous cases considered by the Court prior to ruling on this motion, the Court has "'an obligation to foresee problems over representation that might arise at trial and head them off beforehand.'" Basham, 561 F.3d at 323-24 (quoting United States v. Howard, 115 F.3d 1151, 1155 (4th Cir. 1997)). Therefore, as suggested by the Court at the hearing, and as agreed to by Perry's current counsel at the hearing, the Court INSTRUCTS Mr. Perry to consult with independent counsel outside of the Williams Mullen law firm to ensure that the best strategic course is to proceed to trial without defense counsel's testimony as part of the defense case.[12]  Should Mr. Perry be

---

[12] Mr. Davis stated at the hearing that if Mr. Perry were to "waive" the right to call counsel as a witness on his behalf, then Perry would

unable to afford consultation with independent counsel, he should report such fact to the Court and the Court will investigate such assertion and explore appointing counsel to perform such limited representation.

The Court assumes that Mr. Perry's current counsel have conducted nothing less than a complete and honest evaluation of the need for their testimony in light of all facts of which they are aware and in light of the intended strategic trial plan. Accordingly, if after consultation with independent counsel, Mr. Perry decides that the best strategic course is to keep both Mr. Davis and Mr. Broughton on the trial team, Mr. Perry and his counsel at Williams Mullen are hereby **ADVISED** that once trial begins, there are no guarantees that defense counsel will be permitted to testify on behalf of Mr. Perry if he has a last minute change of heart. See Hirst, 35 Va. Cir. at 169–70

---

need to speak to independent counsel. Although the question now before this Court is whether the Government's motion demonstrates that Mr. Davis or Mr. Broughton is likely to be a necessary witness on behalf of their client, addressing such question in this context requires the Court to inquire into whether, after self-reflection as to their ethical duties, defense counsel intends on testifying and/or anticipates a need to testify. Presumably, counsel has discussed this issue and their strategic trial plan with Mr. Perry as defense counsel has represented to the Court that it does not intend to rely on defense counsel's testimony as part of Mr. Perry's defense. Stated differently, defense counsel believes that Mr. Perry will be better served having Mr. Broughton by his side at counsel table rather than on the witness stand. With counsel's agreement, and to avoid any later suggestion that a Williams Mullen attorney provided biased advice on this issue, Mr. Perry is instructed to consult with independent counsel to help provide a disinterested viewpoint as to whether Mr. Broughton and/or Mr. Davis is a "necessary" trial witness to be called on behalf of Mr. Perry.

(noting that "counsel and client face harsh consequences if counsel continues while possessed of crucial testimony: the lawyer['] s testimony might be inadmissible; counsel might be subject to disciplinary actions for violations of the code") (citation omitted). Moreover, having been <u>instructed to consult with independent counsel</u>, this Court will not likely credit any future suggestion that Mr. Perry's Williams Mullen attorneys had a self-interest in remaining on the trial team and therefore provided biased advice.[13]

### v. Exceptions within Rule 3.7(a)

In light of the conclusion above that, based on the information before the Court, neither Mr. Broughton or Mr. Davis is a "necessary" witness for the defense, this Court need not

---

[13] This Court recognizes that tactical trial decisions are "left to the judgment of counsel," and absent a few "fundamental issues that must be personally decided by the client," such as a defendant's decision to testify in his defense, "[c]ounsel need not consult with the client about the matter or obtain the client's consent." <u>United States v. Chapman</u>, 593 F.3d 365, 369 (4th Cir. 2010). "[W]hich witnesses to call [at trial] is a classic tactical decision left to counsel, and it remains a decision for counsel even when the client disagrees." <u>Id.</u> (citations omitted). However, here, because the decision at issue is whether defense counsel will themselves be a trial witness, and such decision implicates Mr. Perry's Sixth Amendment right to counsel of choice, the Court agrees with Mr. Davis that the best course is not only for Mr. Perry to weigh in on this matter, but to afford him the opportunity to discuss the matter with independent counsel. That said, if either Mr. Davis or Mr. Broughton anticipate a likely need for his own testimony at trial on behalf of his client, he must of course comply with his ethical duty <u>regardless of his client's viewpoint</u>. <u>Cf.</u> Virginia L.E.O. 1359, June 28, 1990 (indicating that "[w]here there is doubt as to whether an attorney should testify on behalf of his client, the attorney should consider the interests of the client and if the client's interests would be better served by his attorney's testimony than by his representation, the attorney should withdraw and should side on the issue of testifying").

squarely address the exceptions set forth in Rule 3.7(a), which govern when a lawyer may remain in a case even if his or her testimony is "necessary," and include when the issue to be testified to is "uncontested" and when withdrawal would constitute a "substantial hardship" on the client. Although this Court does not squarely address such exceptions, in light of the evidence currently before the Court, including Mr. Perry's and Mr. Broughton's consistent affidavits, there appear to be potentially compelling arguments supporting a finding that defense counsel's testimony "relates to an uncontested issue"[14]

---

[14] Although the Government insists that the testimony that would be offered by defense counsel relates to a contested issue, it appears to the Court that the Government contests the inferences that should be drawn from Mr. Perry's 2014 conduct, not the conduct itself. Mr. Perry and Mr. Broughton both submitted affidavits and the sworn statements therein are entirely consistent. The Government has not presented any contrary evidence, and admits that it does not question the accuracy of Mr. Broughton's statement. Rather, the Government seeks to elicit at trial defense counsel's admission that counsel was in essence "operating in the dark" because Mr. Perry failed to admit criminal wrongdoing to his lawyers. However, defense counsel's oral representations to the Court and the information contained in the sworn affidavits demonstrate that neither defense counsel, nor Mr. Perry, dispute the fact that Mr. Perry has consistently told his lawyers that his former employees were stealing from CPC and Medicaid. Accordingly, the real dispute envisioned by the Government appears to be whether Perry is guilty of criminal activity occurring between 2009 and 2013, not what he told his lawyers in conjunction with the 2014 complaint. In essence, the Government contends that because Perry is guilty of crimes in 2009 - 2013, there is no reasonable explanation for his 2014 conduct. In contrast, Mr. Perry asserts that because he is innocent of crimes in 2009 - 2013, there is an exceedingly reasonable explanation for his 2014 conduct. In the end, the parties' differences appear to be focused on what happened between 2009 and 2013, and not on what Mr. Perry did, or said to his lawyers, in 2014.

and/or that, disqualification of Mr. Broughton would work a "substantial hardship"[15] on Mr. Perry.

### D. Application of Rule 3.7(b)

Having concluded that disqualification is not warranted based on Mr. Perry's need to call his counsel as a witness for the defense, the Court must separately consider whether defense counsel should be disqualified based on the possibility that the

---

[15] It is undisputed that Mr. Broughton has worked on this case for a year and a half, and it appears that this case involves hundreds of thousands of documents, multiple alleged frauds, a fact-intensive defense alleging fraud by CPC employees, and a jury trial that is expected to last three full weeks. Especially when balanced against the fact that Mr. Broughton's testimony is only relevant to a tangential matter, it appears that the loss of Mr. Broughton from the trial team may constitute a substantial hardship. See VA Rule Prof'l Conduct 3.7, Comment 4 ("Whether the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is a risk of such prejudice, in determining whether the lawyer should be disqualified due regard must be given to the effect of disqualification on the lawyer's client.") (emphasis added); VA L.E.O. 976, Sept. 1, 1987 (indicating that a substantial hardship might exist where "a complex suit had been in preparation over a long period of time and a development which could not be anticipated makes the lawyer's testimony essential"); In re Chantilly Const., 39 B.R. at 473 (indicating that it would be a "substantial hardship" for counsel to withdraw after providing "approximately one thousand (1,000) hours of services"). Moreover, this Court is not unmindful of the substantial resources of the U.S. Attorney's Office and investigating agencies in prosecuting a complex federal criminal case as contrasted with the resources of an accused citizen defending such a case. It is notable that, unlike many criminal cases tried before this Court, the Government has assigned two Assistant United States Attorneys to the criminal trial team. The defense's contention of an extreme hardship therefore may ring true, because even if the trial was again continued, it appears doubtful that any replacement counsel could timely develop a familiarity with the law, the facts, and with Mr. Perry, equal to that obtained by Mr. Broughton over the last year and a half.

Government will call defense counsel as a witness (either in its case in chief or on rebuttal).  The controlling rule states:

> **Lawyer As Witness**
> . . .
> (b) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer may be called as a witness <u>other than on behalf of the client</u>, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client.

Va. Rule Prof'l Conduct 3.7(b) (emphasis added).  As set forth in the plain language of such rule, a lawyer is not prohibited from acting as both counsel and a witness in the same trial if such attorney will be called only by <u>opposing counsel</u> and his testimony will not be prejudicial to his client.

As discussed above in Part III.A.i, Virginia Rule 3.7(b) essentially incorporates former Virginia DR 5-102(B) into the current Rules of Professional Conduct.  Interpreting and applying former Rule 5-102(B), another judge of this Court established a three-part legal test governing the resolution of a motion to disqualify opposing counsel based on <u>the moving party's intention to call opposing counsel</u> as a trial witness, stating:

> [D]isqualification under DR 5-102(B) must be accompanied by a showing that the testimony of the lawyer is (1) relevant; (2) necessary; and (3) is or may be prejudicial to the client whose lawyer is to be called as a witness by the adverse party.  The moving party bears the substantial burden of demonstrating specifically how and as to what issues in the action the prejudice exists or is likely to occur.

*Personalized Mass Media*, 899 F. Supp. at 243 (internal citation omitted); *see* Virginia L.E.O. 1394, Feb. 15, 1991 ("'[W]hen an attorney is to be called other than on behalf of his client, a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client.'") (quoting *Cottonwood Estates v. Paradise Builders*, 624 P.2d 296, 302 (Az. 1981)).

Here, as the moving party, the Government bears a "substantial burden" to demonstrate that defense counsel's testimony is relevant, necessary, and may be prejudicial to Mr. Perry. *Personalized Mass Media*, 899 F. Supp. at 243. If the applicable test were otherwise, the ethical rules could be improperly utilized to unseat opposing counsel solely for strategic purposes.[16]  Because, here, there is no assertion that

---

[16] This Court reiterates that the fact pattern in this case involves a purported need for defense counsel to testify based on conduct occurring nearly a year and a half after counsel was retained. The recency of the factual developments to which defense counsel's testimony is relevant coupled with the previously uncontemplated need for defense counsel's testimony not only dictate application of Rule 3.7(b), but are factors that are considered in the balancing conducted by the Court as they are in stark contrast to scenarios where counsel and client know from the outset of representation that there is a potential or likely conflict of interest. *See* Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 92-93 (2014) (discussing factors that courts typically consider with respect to a lawyer's conduct, including "the state of

defense counsel's testimony is not "relevant," the Court focuses its analysis on the second and third prongs of the test set forth in Personalized Mass Media.

### i. "Strictly Necessary"

In determining whether the Government has carried its "substantial burden" to prove the necessity of opposing counsel's testimony, it appears well-settled that, in both state and federal courts applying the Virginia ethical rules, the moving party must demonstrate that "'the witness-advocate's testimony is 'strictly necessary,' not merely that it is relevant and useful.'" Ford Motor Co., 2013 WL 4498698, at *4 (quoting Sutherland v. Jagdmann, No. 3:05cv042, 2005 WL 5654314, at *2 (E.D. Va. Oct. 31, 2005)) (emphasis added); see Teleguz v. Commonwealth, 273 Va. 458, 491 (2007) (quoting Sutherland for the proposition that a "party seeking to invoke the witness-advocate rule for disqualification purposes must prove that the proposed witness-advocate's testimony is strictly necessary").

Here, similar to the analysis set forth above regarding whether defense counsel is "necessary" as a witness for the defense, the Court finds that the Government has not at this time carried its burden to demonstrate that defense counsel's testimony is "strictly necessary" to the Government's case.  See

the lawyer's knowledge about the conflict" and whether the lawyer "might have inadvertently engaged" in the conduct at issue).

Sutherland, 2005 WL 5654314, at *2 (finding that the moving party did not carry its "'substantial burden' to prove the necessary elements of the witness-advocate rule" as it failed to describe how such testimony was "genuinely unique so as to be strictly necessary"). First, due to the tangential nature of the issue to which defense counsel's testimony is relevant, it appears that, if the Government's allegations are true, the Government could prove that Perry is guilty of each and every crime charged in the superseding indictment without ever mentioning a single event occurring after January of 2013. Not one offense charged in the indictment relies on any conduct occurring in 2014, by Perry or by his counsel, nor is the 2014 conduct an affirmative defense to any conduct charged in the superseding indictment. Rather, the Government appears to believe that the 2014 conduct will strengthen its case through proving Perry's "guilty knowledge." Cf. Diozzi, 807 F.2d at 14 (setting aside the defendants' convictions based on the district court's improper disqualification of defense counsel in a case where the government called defense counsel as witnesses in an effort to prove "defendant's consciousness of guilt").

Second, while the Court does not seek to underplay the relevance of Perry's 2014 conduct to the Government's case, or to Mr. Perry's defense asserting that CPC employees committed crimes against Medicaid and CPC, the 2014 conduct is but one

example of Mr. Perry's stated position that his former employees are responsible for criminal activity. Mr. Perry took such position as early as the day that CPC's offices were searched, and shortly thereafter Perry tried to convince federal authorities to investigate CPC staffing coordinator Vernice Spain and witness an upcoming meeting she was having with another CPC employee. After federal authorities declined to witness such meeting, in December of 2012, Mr. Perry fired CPC employees Vernice Spain and Sarina Freeman and both accused them of embezzlement and told them that they were being investigated by the FBI for Medicaid fraud. Based on such facts, which appear to be supported by documentary evidence, the Government is surely not surprised that, in early 2014, Perry maintained his position that former CPC employees had both embezzled funds from CPC and were the individuals responsible for fraud on Medicaid. Additionally, Mr. Sears (and Mr. Perry if he testifies) can both be questioned by the Government about Williams Mullen's involvement in drafting the complaint that was filed with local authorities in April 2014. The defense has also offered to stipulate to the information in the affidavits before this Court outlining counsel's involvement in filing the 2014 complaint. Although the Government plainly desires to directly question Mr. Broughton about facts associated with the drafting of such complaint, the Government has at best

demonstrated that such testimony could be "helpful and useful" to the Government's case, not that it is "strictly necessary." See Flamm, supra, at 234 (indicating that when a party seeks to call opposing counsel as a witness, and moves to disqualify on such basis, some courts require "a showing that the evidence sought to be obtained from counsel is not merely relevant and admissible, but indispensable - particularly in a criminal case; because, when the government plans to call[] defense counsel to testify, the Sixth Amendment right to choose counsel is implicated").

In a similar vein, even if Perry took the stand at trial and testified that he reported the embezzlement to local authorities in 2014 on the "advice of counsel," defense counsel's testimony would still not be "strictly necessary" because not only can Perry be thoroughly cross-examined on such issue, but he must presumably testify consistently with the affidavit that he provided to the Court, and with the affidavit that Mr. Broughton provided to the Court. See Flamm, supra, at 249 (citing various cases in support of the assertion that "a 'necessary' witness is not the same thing as the 'best' witness; testimony may be relevant, material, helpful, and useful - even extremely useful - without, strictly speaking, being necessary"). Although the Government may ultimately demonstrate to the Court that it should be permitted to call Mr. Broughton

as a trial witness, it is notable that defense counsel has offered to stipulate not only to all facts contained within the affidavits, but to "any true fact" associated with counsel's advice to Perry regarding the filing of the 2014 complaint. As previously indicated, the consistent sworn positions taken by both Mr. Perry and Mr. Broughton establish that counsel's involvement in the 2014 complaint was predicated on CPC records and Mr. Perry's assertions to counsel that former CPC employees had stolen money from CPC. Perry Aff. ¶¶ 13-14; Broughton Aff. ¶¶ 13-14. Accordingly, counsel's post-indictment involvement in preparing a written document containing Mr. Perry's version of the facts does not render counsel's testimony "strictly necessary."

In considering defense counsel's involvement with the 2014 complaint, and whether such involvement renders counsel's testimony "strictly necessary," this Court agrees with the analysis in United States v. Evanson, No 2:05cr805, 2006 WL 2992561 (D. Utah Oct. 18, 2006), a case where the government sought to disqualify defense counsel based on counsel's limited involvement in what the government characterized as post-offense efforts in the vein of obstructive conduct. In denying the motion to disqualify, the court noted, among other things, that: (1) "the areas of [counsel's] alleged knowledge are tangential and speculative"; (2) the disputed conduct "occurred after the

alleged wrongdoing in the indictment"; and (3) the documents associated with the post-offense conduct "themselves are evidence," further undercutting the need for counsel to testify about such documents. Id. at *5. After reviewing additional reasons why the motion to disqualify lacked merit, the Evanson court explained as follows:

> The government's motion has serious implications on the interests of justice. If counsel who assist clients in investigative stages are to be disqualified in trial stages, defendants will be substantially restricted in their choice of counsel. Those being investigated will be substantially restrained in their ability to consult counsel in investigative stages if such counsel are subject to being called as witnesses. A person under investigation will be restricted in resolving the legal implications of on-going business activities. These infringements on the activities of counsel and the client's right to choose are serious.

Id. at *6.

Defense counsel's involvement in the filing of the 2014 complaint also appears similar to the conduct of defense lawyers in United States v. Diozzi, where in response to an IRS investigation, defense lawyers made detailed pre-indictment submissions to the IRS and Department of Justice on behalf of the defendants. Diozzi, 807 F.2d at 11. Government prosecutors in Diozzi convinced the district court that defense counsel were "material witnesses" that were necessary at trial to prove the defendants' "consciousness of guilt" based on the asserted existence of numerous false or misleading statements contained

69

in the written pre-indictment submissions that had been prepared by defense counsel.  Id. at 12.   In reversing the district court's improper disqualification of defense counsel, the First Circuit explained that it "fail[ed] to see how [defense counsel], by submitting factual statements to the government under power of attorney on behalf of their clients, had vouched for the truth of those statements in a manner requiring their disqualification."  Id. at 14.   Rather, counsel's submissions were "no different" than any pretrial motion or memorandum where counsel presents his "client's view of the facts" based on information his client has provided to counsel.  Id.  Similarly, here, counsel's involvement in the filing of the 2014 complaint did not "vouch" for the fact that the reported transactions constituted embezzlement, counsel merely prepared such complaint as part of Perry's defense based on the information and records provided by Perry.[17]

It thus appears that defense counsel's testimony establishing that Mr. Perry denied his guilt to his lawyers and

---

[17] As stated at oral argument, the Government asserts that the 2014 embezzlement complaint, which was prepared by Mr. Broughton, is misleading and false.  The Government further asserts that it seeks to attribute such falsities to Mr. Perry, not to his counsel.  It therefore appears that the "most accurate evidence of the statements contained in the written [complaint] [is] not counsel's memories of the contents of the [complaint], but rather, the written [statements] themselves" coupled with either Mr. Perry's testimony, defense counsel's offered stipulation, and/or Mr. Sears' testimony, that such information is based on CPC records and Mr. Perry's consistent and repeated assertions that the checks discussed therein were not authorized by CPC or Mr. Perry.  Diozzi, 807 F.2d at 13.

pointed the finger at former CPC employees would be an undisputed and largely unremarkable factual assertion. The Government therefore fails to carry its substantial burden to demonstrate that defense counsel's testimony is "strictly necessary" to the Government's case.

### ii. Testimony "is or may be prejudicial to the client"

Turning to the third prong of the Personalized Mass Media test, the prejudice prong, "[t]he moving party bears the substantial burden of demonstrating specifically how and as to what issues in the action the prejudice exists or is likely to occur." Personalized Mass Media, 899 F. Supp. at 243 (emphasis added) (citing cases). Here, the Government's primary contention of prejudice appears to be that any testimonial admission by defense counsel that Mr. Perry denied his guilt to his lawyers and characterized the July 2012 bonus checks as "unauthorized" will be prejudicial to the defense because the trial evidence will clearly demonstrate that Perry is guilty of fraud crimes. Having considered such argument, and having carefully compared the information in the affidavits submitted by Mr. Perry, former CPC CFO Sears, and Mr. Broughton, as well as considering the Government's express opportunity to explain at oral argument "specifically how" defense counsel's testimony is likely to prejudice Mr. Perry, the Court finds that the Government has failed to carry its "substantial burden."

As already discussed at length, the Court finds it unremarkable that leading up to the 2014 complaint, Mr. Perry continued to assert his innocence to his lawyers and continued to point to his former employees as the guilty parties. The Court therefore fails to appreciate why the jury would hold it against Perry that he asserted his innocence to his lawyers, any more than they would hold it against him that he is asserting his innocence at trial. In actuality, the Government appears to be arguing that Perry's defense in total will be discredited by the trial evidence directly relevant to the charged fraud crimes, not that he will be prejudiced by what his lawyers would say regarding the 2014 report of embezzlement to local authorities.[18] The Government therefore fails to specifically demonstrate that defense counsel's testimony is or may be prejudicial to Mr. Perry. See Stanwood Corp. v. Barnum, 575 F. Supp. 1250, 1251-52 (W.D.N.C. 1983) (rejecting an interpretation of predecessor North Carolina disciplinary rule DR 5-102(B) that would allow a "party to deprive his adversary of the counsel of

---

[18] Associated with the instant issue was a discussion at the motions hearing regarding the scope of the Government's intended questions of defense counsel should Mr. Broughton or Mr. Davis testify at Mr. Perry's criminal trial. Although a matter for another day, as stated on the record at the hearing, the Court has significant reservations regarding the Government's characterization of the scope of Mr. Perry's waiver of the attorney-client privilege as involving matters beyond discussions with his lawyers associated with whether the checks that were reported to local authorities in 2014 were "authorized" by Perry/CPC, or unauthorized embezzlement by former employees. Perry Aff. ¶¶ 13-14; Broughton Aff. ¶¶ 13-14.

his choice" without advancing "proof that the substance of counsel's testimony (if offered) will compromise [his client's] case"); Clinton Mills, Inc. v. Alexander & Alexander, Inc., 687 F. Supp. 226, 231 (D.S.C. 1988) (interpreting predecessor South Carolina disciplinary rule DR 5-102(B) as requiring an opposing party to demonstrate a "concrete showing of prejudice" which is "more than de minimus" [sic]) (internal quotation marks and citations omitted).[19]

Moreover, in considering all of the relevant arguments and attempting to best prognosticate how this matter will play out at trial, the Court disagrees with the Government's suggestion that disqualification is warranted due to defense counsel "injecting" itself into the "fact pattern" of this case. Although what constitutes the "fact pattern" of this case is amorphous and turns on each party's presentation of evidence, the fact pattern of this case is primarily defined by the

---

[19] The Government also contended at oral argument that it will be prejudicial to Perry if his counsel testifies that counsel and Perry never had a conversation about whether Mr. Perry should advise local authorities that he had been federally indicted.  The Government, however, fails to demonstrate why such fact is prejudicial to Perry, especially in light of Perry's own admission that no such conversation took place.  If defense counsel testifies and confirms the absence of a conversation, it would only prove that Perry is telling the truth. The Court's analysis may be different if counsel told Perry that he should alert local authorities to such fact and he did not.  However, the fact that a lawyer might not have recognized the need to make such point to local authorities (perhaps because of the press coverage of this case) arguably helps Perry as it would support the contention that, like his attorney, Perry also never thought about telling local authorities that he had been indicted federally.

allegations in the superseding indictment, charging illegal conduct occurring between January of 2009 and January of 2013. The tenor of the Government's oral argument suggested that the Government has somehow been disadvantaged by defense counsel's participation in Perry's 2014 conduct.   However, it is the Government, and not the defense, that seems most interested in focusing on such post-indictment facts.   Even assuming that Perry was acting in 2014 with improper motives in an effort to tamper with witnesses, by all accounts such efforts never came to fruition because local authorities further researched the 2014 complaint and never attempted to arrest, or even interview, the three individuals identified by Mr. Perry and Mr. Sears. Accordingly, although it is impossible to predict how the jury will view the 2014 evidence, it appears that such evidence will either be a boon to the Government, or simply be one very small data-point for the defense that further demonstrates that Perry has consistently pointed his finger at former employees since late 2012, a contention he appears to have shared with his lawyers on numerous occasions over the past several years.

Although Mr. Perry may testify at trial and may reference the "advice of counsel" as to this subject, the Court does not find that such reference, as argued by the Government, constitutes an automatic basis for disqualification regardless of the context.   Notably, as previously explained at length,

74

Perry's claimed reliance on his counsel's advice does not constitute an affirmative defense that acts as a shield to any element of any crime charged in the superseding indictment. Rather, it appears that Perry's reference to his counsel's advice will be a truthful response to the Government's decision to focus on Perry's post-indictment conduct.[20] In previewing his response to the Government's focus on uncharged accusations of misconduct, Perry and his counsel have both revealed that, similar to the fact pattern in Diozzi, counsel's actions in 2014 were predicated on Mr. Perry's representations and merely present the "client's view" of the relevant facts. Accordingly, although Perry might speak the words "advice of counsel" from the stand, the Government will easily establish through cross-examination that counsel's advice was predicated, at least in part, on Mr. Perry's own characterization of the facts to his attorneys. Accordingly, a reference by Mr. Perry to the "advice of counsel" does not have the talismanic effect of automatic disqualification because the facts currently before the Court and associated with counsel's advice are undisputed, and the true dispute turns on whether Perry engaged in fraud between 2009 and 2013.

---

[20] As noted throughout this opinion, Perry's affidavit conforms entirely to Mr. Broughton's affidavit and the Government acknowledges that it has no basis (or intention) of challenging the veracity of Mr. Broughton's sworn statements.

Because the prejudice analysis turns largely on the application of ethical rules, a matter that is self-regulated unless and until there is an apparent ethical violation, a degree of deference should be afforded to Perry and his counsel to determine, based on their direct knowledge of the relevant facts, whether counsel's testimony will be detrimental to Mr. Perry if Mr. Broughton or Mr. Davis are called as a witness by the Government. See Sanford, 687 F. Supp. 2d at 602 ("The rules of professional responsibility make clear that the resolution of conflict of interest questions is principally the responsibility of the lawyer undertaking the litigation.") (emphasis added); Va. Rule Prof'l Conduct 1.7, Comment [9] (indicating that "[r]esolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation," that while the court and "opposing counsel may properly raise the question," an objection from opposing counsel "should be viewed with caution"). Here, the Court expects each attorney representing Perry to perform nothing less than a complete, honest, and searching self-inquiry into the potential that his testimony would hurt his client. See Va. Rule Prof'l Conduct 3.7, Comment [6] ("Where a lawyer may be called as a witness other than on behalf of the client, paragraph (b) [of Rule 3.7] allows the lawyer to continue representation until it becomes apparent that the testimony may be prejudicial to the client.

Determining whether or not such a conflict exists is primarily
the responsibility of the lawyer involved") (emphasis added).
Subject to the assumption that such inquiry has been faithfully
performed, and in light of the Government's failure to point to
any conflicts between Perry and his counsel's proposed
testimony, or any prejudice likely to flow from defense counsel
testifying, the Government has failed to justify the drastic
step of disqualification of Mr. Perry's chosen counsel.[21]  See
Virginia L.E.O. No. 641, Dec. 19, 1984 (indicating that a lawyer
may continue in a case even when he or she will be called as a
witness by opposing counsel "until it becomes apparent that the
testimony of the [testifying] attorney is or may be prejudicial"
to his client); Virginia L.E.O. 866, Nov. 26, 1986 (same);

---

[21] The Court acknowledges the Government's assertion that it is unclear
from the affidavits before the Court whether the 2014 report to local
police was Mr. Perry's idea that was approved by defense counsel, or
defense counsel's idea that Mr. Perry ultimately agreed with.
Although such distinction could carry some sway with the fact-finder,
considering all of the relevant factors, the Court finds that the
Government's hypothesis as to the possibility of inconsistent
testimony is insufficient to support the drastic step of disqualifying
Perry's chosen counsel. Rather, the Government's speculation about
the potential for inconsistent testimony as to this tangential issue
lends further support to this Court's prior finding that Mr. Perry
should consult independent counsel before confirming to this Court
that his trial plan does not rely on the testimony of any of his
Williams Mullen attorneys. Of course, to the extent that defense
counsel themselves anticipate a conflict between their testimony and
Perry's testimony that is, or may be, adverse to Mr. Perry, counsel
themselves have an obligation to withdraw based on Rule 3.7(b).
Moreover, unlike the rules governing withdrawal when counsel is
necessary to testify on behalf of, and for the benefit of, his client,
to the extent defense counsel identify any "conflict of interest,"
between counsel and client, the entire defense firm is required to
withdraw. Va. Rule Prof'l Conduct 3.7, Comment [6]; Va. Rule Prof'l
Conduct 1.10.

_Tolson v. Secor_, 35 Va. Cir. 77, 79 (Fairfax County 1994)
(denying a motion seeking "the drastic remedy of
disqualification" because although the defendant intended to
call the plaintiff's counsel as a witness, such testimony did
not appear to be prejudicial to the plaintiff).

Based upon the required individualized assessment of this
criminal case, to include the 2014 post-indictment conduct at
issue and the sworn preview of the planned testimony of Mr.
Perry (should he choose to testify), the consistent testimony of
his attorney (should he be called by the Government), and the
consistent testimony of a non-party fact witness (who could be
called by either party), the Court finds that the Government
fails to demonstrate that defense counsel's testimony "is or may
be" prejudicial to the defendant.  See _Aetna Casualty_, 570 F.2d
at 1201-02 (reversing the district court's disqualification
order as improperly based on speculation as to a possible
conflict of interest in light of the accepted representation of
counsel that the multiple defendants' factual positions were all
in alignment).  Although the Government may at this time have an
untested hunch, that through clever cross-examination, it will
be able to elicit slight differences in recollection between
Perry and his counsel, such theory is not only speculative, but
it appears unlikely based on the consistent affidavits before
this Court.  See _Shaffer_, 966 F.2d at 145-46 ("We have held that

disqualification of a litigant's chosen counsel for violation of an ethical canon . . . may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur" and that "some stronger objective indicator—even of 'likelihood'—than simple judicial intuition is needed to warrant the drastic step of disqualification of counsel.") (emphasis added).

This Court's case-specific analysis relies in part on the fact that the entire issue for which disqualification is sought is tangential to the criminal conduct charged in the indictment, and the fact that the Government neither questions the accuracy of defense counsel's proffered testimony or suggests that defense counsel participated in any way in Perry's alleged evil intent to tamper with witnesses. Although the Government is free to proceed at trial in the manner it sees fit regarding presentation of evidence, limited only by later rulings of this Court, the Government's desire to call opposing counsel as a witness, particularly as to a largely tangential issue, is insufficient to justify a disqualification order from this Court.[22] Virginia's current ethical rules, which unlike many

---

[22] For similar reasons, this Court finds uncompelling the Government's speculative contention that the Government will be prejudiced if defense counsel does not testify because defense counsel can act as an "unsworn witness" through "subtly impart[ing] to the jury his first-hand knowledge of the events without having to swear an oath and be

jurisdictions, contain a vestige of the former ABA model disciplinary rules, expressly permit Perry's counsel to continue in this case until it becomes apparent that, if called upon as a witness by the Government, defense counsel's testimony is, or may be, prejudicial to their client.  Mr. Broughton's sworn assertion that Mr. Perry told counsel that he did not authorize the checks in question as part of an illegal conspiracy, but instead that such checks constitute illegal acts of others stealing from CPC, can hardly be seen as prejudicial in light of the defense's apparent trial strategy of presenting <u>the same theory of the case</u> to the jury.

---

subject to cross examination." <u>United States v. Locascio</u>, 6 F.3d 924, 933 (2d Cir. 1993).  First, the Fourth Circuit has not adopted a rule calling for disqualification of counsel of choice in a criminal case based on the "unsworn witness" rule as recognized in <u>Locascio</u>. Second, even if such rule applied in this Circuit, as noted throughout this Opinion, Perry's counsel's knowledge is relevant only to a tangential issue, is entirely consistent with the planned testimony of Mr. Sears and Mr. Perry, and counsel thus lacks any material information that could be "subtly imparted" to the jury.  <u>Cf.</u> <u>Diozzi</u>, 807 F.2d at 14 (rejecting the government's "unsworn witness theory" based on its assertion that even if defense counsel did not testify, they "would have framed questions to witnesses and their summation to the jury in a manner designed to show that all such statements by the defendants . . . were true," explaining that "[c]ompetent trial attorneys usually present their cases in a manner designed to convince juries that their clients are telling the truth," and that "jurors are instructed that the assertions of counsel are not evidence"; therefore, "[d]efense counsel cannot be subject to disqualification merely for arguing their clients' positions on statements that are in evidence").   Any such risk of improper statements by counsel is further reduced by the fact that the Government's motion has drawn this issue into the light, and defense counsel will surely tread carefully to avoid any impropriety and ensure that all of their statements from the podium are as advocates, not witnesses, lest the Court remind the jury of such fact.  In sum, on these facts, this Court envisions virtually no risk that the Government will be prejudiced through defense counsel acting as an "unsworn witness."

### E. Implications of the Court's Denial of the Government's Motion to Disqualify Defense Counsel

There is no doubt that the stakes of this criminal prosecution are high.   Mr. Perry is charged with eighteen federal felonies, he has apparently already lost his business, and the upcoming criminal jury trial is expected to last three full weeks.   The Government represents that it is seeking disqualification of defense counsel in part based on its overarching concern of avoiding having a "taint" on any conviction obtained which could result in the need to try this complex case twice.   However, it must be underscored that the Government's intent to focus on Perry's 2014 conduct appears to be motivated primarily by its desire to use such conduct to the Government's advantage, and although the Government has every right to present any relevant and admissible evidence, the risk the Government seeks to avoid will in some respects be borne by the Government's voluntary decision to focus a part of its case on a tangential matter occurring long after the termination of the criminal conduct alleged in the superseding indictment.[23]

---

[23] Assuming that defense counsel remain of the opinion that they do not have an ethical duty to testify on behalf of their client, as argued by the defense while referencing DOJ internal policies that seek to avoid, when possible, the Government calling opposing counsel as a witness, the Court would encourage the Government to reassess the importance of defense counsel's live testimony as to this tangential post-indictment conduct, and to meet in person with defense counsel to discuss the possibility of entering into a stipulation that is agreeable to all counsel and Mr. Perry.

Additionally, the Government's desire to avoid the risk of having any conviction set aside through the disqualification of Perry's counsel of choice appears somewhat short-cited as the Government seeks exclusion of both of Perry's lawyers as well as the entire Williams Mullen law firm, while the Supreme Court has clearly labeled the improper disqualification of defense counsel as a "structural error" requiring a retrial regardless of the quality of representation provided by replacement counsel. Gonzalez-Lopez, 548 U.S. at 150; Davila, 133 S. Ct. at 2149. The similarities between defense counsel's conduct here and the conduct of defense lawyers in Diozzi further demonstrates the likelihood that a disqualification order may result in Mr. Perry obtaining a second trial if this Court granted the pending motion.  Accordingly, to the extent the Government advocates the pursuit of an approach that preserves the integrity of the trial outcome, in light of the facts before this Court and Mr. Perry's Sixth Amendment right to retain counsel of choice, such an approach would appear to favor the denial of the pending motion.

## IV. Conclusion

As an initial matter, the Court **GRANTS** Angela Perry's motion, **ECF No. 91**, for leave to join in Mr. Perry's motion seeking a bill of particulars.  The motion for a bill of particulars is therefore construed as a joint motion.

For the reasons set forth in detail above, Defendants' joint motion seeking a bill of particulars as to Count Fourteen of the superseding indictment is **GRANTED**. **ECF No. 64**. The Government is therefore **ORDERED** to identify to counsel for both remaining Defendants the falsified/forged/altered DMAS-90s that the Government will, or may, rely on at trial as evidence of Defendants' guilt as to Count Fourteen of the superseding indictment. The Government should identify such DMAS-90s no later than July 23, 2014, which falls approximately one month before commencement of trial. The Government is further **ORDERED** to immediately supplement such disclosure if it later identifies one or more additional altered or falsified DMAS-90s which it will, or may, rely on at trial with respect to Count Fourteen.

The Government's motion to disqualify defense counsel is **DENIED**. **ECF No. 80**. However, as agreed to by Williams Mullen, the Court **INSTRUCTS** Mr. Perry to consult with independent counsel outside of the Williams Mullen law firm to ensure that the best strategic course is to proceed at trial without defense counsel's testimony as part of Mr. Perry's case rather than having one of Mr. Perry's lawyers withdraw in order to testify as a trial witness on behalf of Mr. Perry. If Mr. Perry is unable to afford independent counsel, he should report such fact to the Court and the Court will investigate such assertion and explore appointing counsel for the limited purpose of providing

Mr. Perry independent advice on this issue.  Once independent counsel is retained and/or appointed, such counsel is **INSTRUCTED** to file a status update with this Court within **twenty-one days**. Such update should explain, without divulging any confidential communications, whether, after an opportunity to fully discuss this issue with disinterested counsel, Mr. Perry maintains that his defense at trial would be better served by both Mr. Broughton and Mr. Davis remaining on the trial team rather than one of them withdrawing from the trial team in order to testify on Mr. Perry's behalf.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ ~~~~~~~~~~~~~~~~~
Mark S. Davis
United States District Judge

Norfolk, Virginia
July  2  , 2014